11380

MORTIMER v. D. T. McKEITHAN LUMBER CORP. *ET AL.*

(120 S. E., 720)

1. ACTION—COMPLAINT IN STOCKHOLDER'S ACTION HELD TO IMPROPERLY UNITE CAUSES OF ACTION.—The complaint, in an action by a stockholder against a corporation and others, alleging a cause of action in plaintiff's favor for additional stock, another in plaintiff's favor for arrears of salary, another in the right of the corporation for damages resulting from mismanagement, another in the right of the corporation for a conspiracy in disposing of its assets, another in plaintiff's favor for an inspection of the records, another in plain-

tiff's favor for an accounting and another for the appointment of receiver, *held* to improperly unite causes of action.

2  APPEAL AND ERROR—NO RELIEF GRANTED AS TO IRREGULARITIES AS TO WHICH NO OBJECTIONS WERE RAISED.—Where no objections were raised to manifest irregularities, *held,* that no relief on that account can be afforded by the Supreme Court.

3.  CORPORATIONS—TRANSACTIONS INVOLVING ORGANIZING NEW CORPORATION TO TAKE OVER OLD CORPORATION'S BUSINESS EXAMINED, AND NUMBER OF SHARES THEREIN OLD STOCKHOLDER WAS ENTITLED TO DETERMINED.—Complicated transactions involving financing an old lumber corporation which was in financial difficulties, and organizing a new corporation to take over the business of the old corporation, examined, and the number of shares of stock in the new corporation which plaintiff, a shareholder in the old corporation, was entitled to determined.

4.  CORPORATIONS—FRICTION BETWEEN MANAGER AND PRESIDENT HELD NOT TO JUSTIFY DISCHARGE OF MANAGER.—Where a new corporation was organized to take over the business of an old corporation, and plaintiff, the general manager of the old corporation, was demoted to the position of manager of the new corporation and was given a smaller number of shares in the new corporation than he was entitled to, friction between plaintiff and the president of the new corporation *held* not to justify discharging plaintiff.

5.  CORPORATIONS—EVIDENCE HELD NOT TO WARRANT CHARGING DIRECTORS WITH DEPLETION OF CORPORATION ASSETS.—In an action by a stockholder in a lumber corporation, evidence *held* not to warrant charging directors with depletion of corporate assets on the theory of their alleged culpable negligence.

6.  CORPORATIONS—GROSS NEGLIGENCE OR WILLFUL DESTRUCTION NECESSARY TO RENDER OFFICERS LIABLE FOR DEPLETION OF CORPORATE ASSETS.—To render officers personally liable for depletion of corporate assets, they must be either grossly negligent in the management of the business or guilty of willful destruction.

7.  CORPORATIONS—EVIDENCE OF OFFICERS' DIVERSION OF CORPORATE FUNDS AUTHORIZED CIRCUIT COURT'S ACTION.—In stockholder's action, evidence *held* to warrant the Circuit Court in sustaining the Master's finding charging one officer with diverting corporate funds to pay expenses of another corporation and overruling a similar finding as against another officer.

8.  CORPORATIONS—EVIDENCE HELD TO WARRANT ORDER RESCINDING DIRECTORS' RESOLUTIONS TO PAY THEMSELVES SALARIES.—In stockholder's action on behalf of a lumber corporation, evidence *held*

to warrant an order requiring directors to rescind a resolution voting themselves excessive salaries and to authorize a judgment against one of the directors, who had drawn his salary, for the amount thereof.

9. CORPORATIONS—OFFICER LIABE FOR AUDIT MADE FOR PERSONAL GRAT-IFICATION.—Where an officer had an audit of corporate assets made for his personal gratification, he is liable for the amount thereof.

10. CORPORATIONS—ENTITLED TO RECOVER FROM OFFICERS COST OF LITI-GATION RESULTING FROM MISMANAGEMENT.—Corporation *held* enti-tled to recover from two officers cost expenses and disbursements in connection with a litigation resulting from their mismanage-ment.

11. CORPORATIONS—EVIDENCE HELD TO ESTABLISH LIABILITY AGAINST DIRETORS FOR AUDIT.—In stockholder's action, evidence *held* to authorize the conclusion that plaintiff was entitled to judgment primarily against directors and secondarily against corporation for the amount of corporate funds paid for an audit, and that corporation was entitled to a judgment for that amount against directors.

Before PEURIFOY, J., Darlington, Fall Term 1921. Af-firmed as modified.

Action by James Mortimer, Jr. against D. T. McKeithan Lumber Corporation and others. From the decree rendered both parties appeal.

*Messrs. James R. Coggeshall* and *M. C. Woods,* for plaintiff, cite: *Majority stockholder exercising control is a trustee for the minority stockholders:* 250 U. S., 483. *Failure of directors to exercise reasonable and ordinary care in conducting corporation's business renders them liable for loss resulting therefrom:* 94 Atl., 121; 109 N. E., 96; 98 N. E., 781; 161 S. W., 230; 60 So., 897, *and they are liable for excessive unwarranted salaries fraudulently and wrongfully voted:* 120 N. Y. S., 350; 100 Atl., 648. *In equity case costs are in discretion of trial Judge:* 82 S. C., 109. *Effect of testimony where witness refuses to an-swer:* 38 Am. Dec., 643, 651, 552; 58 Barb., 241; 63 N. Y., 77; 87 N. Y. S., 343.

*Messrs. George E. Dargan, George H. Edwards* and *T. C. Cork,* for defendants, cite: *Remedy of minority stockholders:* 250 U. S., 483.

The report of Robert Macfarlan, Judge of Probate, Acting Master, was as follows:

For many years prior to the happening of the things out of which the litigation in this cause has arisen, there was conducted at Lumber, in said county and State, a large sawmill operation under various names. Prior to the organization of the D. T. McKeithan Lumber Company on July 6, 1911, the history of this business is of no value in determining the issues in the present cause. On July 6, 1911, the D. T. McKeithan Lumber Company was organized with a capital stock of $200,000 of the par value of $100 per share in common stock and took over the operation of the property. In addition to the $200,000 capital stock, there was issued $300,000 in bonds which were held and owned by Messers J. M. Barr, D. T. McKeithan, and W. R. Bonsal, who are characterized throughout the testimony as the bondholders and will be so treated in this report. The $200,000 stock was owned and held, 1,050 shares by Mr. E. M. Poston and interests allied with him. This stock was treated in the taking of the testimony, and will so be treated in this report, as the Poston stock. The remaining 950 shares were held, by the bondholders 350 shares, by J. Mortimer, Jr., 400 shares, and by R. L. Gilliam 200 shares. J. Mortimer, Jr., had paid $15,000 in cash for the stock held by him and had given his note to the bondholders in the sum of $25,000, with the stock as collateral, for the unpaid portion of his stock, and R. L. Gillman had paid $2,000 in cash, and had given his note for the remaining $18,000, to the same parties and for a like purpose.

Subsequently, litigation arose between the bondholders and the company in the District Court of the United States

for the Eastern District of South Carolina, the company and its majority stockholders alleging that the bondholders had sold under representations of a given amount of standing timber, whereas no such amount of timber passed in the purchase. As a result of this litigation and of injunctions arising out of it, the operation of the property was tied up for a period of approximately 18 months. During the period of its operation, the enterprise had been financed by E. M. Poston, who made it known during the litigation above referred to that he did not purpose to finance any further. When this situation arose, seeing that they would lose their savings, J. Mortimer, Jr., and R. L. Gilliam undertook to bring about some adjustment, whereby the property would be rehabilitated and restored to active operation. Among their plans they undertook to get the bondholders to stop the litigation in the United States Court and to furnish the necessary funds with which to commence operations. This the bondholders agreed to do, provided Mr. D. T. McKeithan would take active charge of the operations, and Mr. D. T. McKeithan agreed to do so; but before the parties could put this plan in operation, his health failed, and the whole arrangement fell through.

Still with the purpose in view of saving themselves, Mortimer and Gilliam went to Columbus, Ohio, where they had a conference with representatives of Ohio National Bank, the City National Bank, and the New York Coal Company; all of them being corporations located at Columbus, Ohio, and representing the debts of the company, excepting small floating debts for materials and supplies. As a result of this conference, all parties entered into two contracts, the terms of which are clear and which it is unnecessary to analyze in detail. The general plan, however, was that the company would turn over to the president of Ohio National Bank all manufactured lumber then on the yard, receivables and certain real estate not

covered by the lien of the mortgage to the bondholders, upon the understanding that the floating debts of the company were to be paid in full out of the moneys collected from the receivables, and any balance, together with the lumber on the yard, and certain real estate not covered by the lien of the mortgage to the bondholders, was to be applied proratably to the debts of the three creditors above named in full satisfaction of their claims. The Poston stock was to be surrendered, and was to be divided half and half between J. Mortimer, Jr., and R. L. Gilliam. All of these arrangements, however, were contingent on Mortimer and Gilliam obtaining from the bondholders what is characterized throughout the testimony as a modification of the mortgage, and which it will be necessary to explain somewhat to make the situation clear.

The original mortgage, given by the company at the time of its organization, required the company to pay the entire interest on the bond issue, and to retire $30,000 bonds annually. This requirement was rigid, and the company had to meet the interest and the bond retirement regardless of fire, high water, strikes, or other contingencies. that might make it impossible for it to acquire the funds for such purposes. The requirement of the contract entered into by the parties at Columbus contemplated a more elastic mortgage by the terms of which the company would not have to meet the bond retirement, but only the interest in the event it was not able to operate successfully by reason of high water, adverse market conditions, or other agencies over which it had no control.

When these contracts had been duly executed, both Mortimer and Gilliam proceeded to interview the bondholders and to undertake to get them to agree to carry out the arrangement. The property having been idle for some time, it was to the interest of the bondholders that operations be resumed, because in that way alone could they look

for payment of their securities. Hence Mortimer and Gilliam found them favorably inclined to any plan which would result in the making of the corporation a going concern. It is unnecessary to go into details of the various interviews had by the parties, but to refer rather to the result of such interviews. As a result of the activities of Mortimer and Gilliam, a conference was had at Florence in the office of Messrs. Willcox & Willcox in June, 1915, where the tentative contract was entered into for the purpose of carrying out the plans embodied in the Columbus agreements. J. M. Barr, one of the bondholders,, considering himself aggrieved by the conduct of E. M. Poston in the litigation had in the United States Court, flatly refused to enter into any consumation of the scheme, unless, in addition to the surrender of his stock as provided for in the Columbus agreements, Poston would also surrender the claim of the New York Coal Company against the company. In other words, Mr. Barr required the entire elimination of Poston and of any of his affiliated interests as a condition for his assent to the agreement.

As a result of the conference in the office of Willcox & Willcox, the parties entered into a contract which was executed and delivered upon a gentleman's understanding that it was not to become operative, unless a compliance was had with the conditions imposed by Mr. Barr. Emil Kieswetter, who was president of Ohio National Bank, and who was present representing the three large Columbus, Ohio, creditors, agreed to undertake to have Poston comply with the conditions imposed by Barr. Subsequently, he (Kieswetter) reported that the Poston stock was in his hands for the benefit of Mortimer and Gilliam, and that Poston had surrendered to him the claim of New York Coal Company. The June agreement entered into in the office of Willcox & Willcox then became operative.

The June agreement was known as a tentative or preliminary agreement, and the parties, including Kieswetter,

again met at the office of Willcox & Willcox in July, 1915,
and entered into a permanent agreement carrying out the
plans embodied in the June, 1915, contract.   In addition
to the agreements above referred to, the bondholders were
to turn over to Mortimer and Gilliam the notes which they
held with stock as collateral and also the 350 shares of stock
owned by the bondholders.   Subsequently, their attorney did
turn over the notes and all of the stock to Mortimer, who
carried out to the letter the spirit of the agreement which
he had with Gilliam in respect to equalizing their stock-
holdings.   He turned in the $35,000 stock for retirement,
and had it reissued, $7,500 to himself, and $27,500 to
Gilliam.   Adding these amounts to the $40,000 and $20,000
stock already held by them, respectively, each became the
owner of $47,500 stock, besides the Poston stock which
Kieswetter held for them.

The attorneys prepared the modified mortgage, which was
duly executed and recorded.

All arrangements having been perfected, Mortimer and
Gilliam went to work to make necessary repairs to the plant,
railroads, and logging equipment, so as to begin active
operations.   This required something like 60 days.

After the property was put into operation and had com-
menced the manufacture of lumber with R. L. Gilliam as
president and executive head of the company, and J. Mor-
timer, Jr., in charge of operations, in November, 1915,
Gilliam approached Mortimer on the yard of the company
and suggested to him the advisability of not counting cer-
tain manufactured lumber which came under the sinking
fund clause of the mortgage.   In this connection, the mort-
gage had a sinking fund clause which required the company
to deposit with the trustee $2.50 per thousand feet for each
thousand feet of timber cut to be applied to interest and bond
requirements.   The effect of Gilliam's suggestion to Mor-
timer would have been to withhold from the bondholders
the just amount due under the sinking fund, which the

testimony shows would amount to 25 per cent. or more of total cut, and leave in the treasury of the corporation money justly due the bondholders. The testimony shows that Mortimer and Gilliam had considerable discussion over this suggestion, with Mortimer sternly refusing to consent thereto, and Gilliam insisting thereon; in so much so that the discussion became acrimonious and unpleasant. I have no hesitancy in so finding, because Mr. Mortimer so testified in very plain terms, and in his testimony, Mr. Gilliam makes no denial whatever. That such discussion did occur is corroborated by the fact that Mortimer subsequently discovered to his great astonishment that certain lumber was not being counted, and on investigation traced instructions whereunder the employees were acting to Gilliam. If any further corroboration were needed, it would be found in the fact that, after Mortimer was forcibly ejected from any participation in the operations of the enterprise, the short counting of the lumber for the sinking fund again occurred and became the subject of a bitter controversy between the bondholders and the officers in charge of operations, in so much so that the bondholders forced the payment of a large sum for shortage, placed their own man on the yard to check the cut, and made the corporation pay half of his salary, and they kept their man to watch the operation, certainly until the day of the closing of the taking of the testimony in this cause. The actual count of the tally man to the bondholders shows, according to the amount of shortage testified to by both Barr and Gilliam, that Mortimer's estimate of 25 per cent. of the total cut as being the amount which Gilliam proposed not to count was entirely too low.

I have dwelt with some detail on this controversy between Mortimer and Gilliam, because it is the key and motive of what subsequently occurred.

Soon after the disagreement between Mortimer and Gilliam just referred to, Gilliam went to Mortimer and told him that Poston was claiming to have an interest in the

stock deposited by him with Kieswetter, and was taking the position that his stock should go back to him instead of being divided equally between Mortimer and Gilliam. As to. what occurred between Gilliam. and Mortimer, their stories may differ in unessential details; but they do agree that Gilliam conveyed such information to Mortimer, and that both of them, certainly Mortimer actually, and Gilliam pretensively, were in great consternation as to what to do.

When this situation arose, and Gilliam disclosed to the bondholders, as well as to Mortimer, the position which he claimed Poston was taking, Mr. Barr, who was the principal bondholder, was greatly enraged, because he had unquestionably entered into the modified mortgage, and the two contracts leading up to it, on the understanding that the Poston interests were eliminated, and immediately began to take steps looking toward a foreclosure of the bond mortgage. As a result of various conferences and interviews of all parties, the foreclosure was started.

In the great conflict of testimony and the numerous versions given by the different parties, it is unquestionably true that the bondholders agreed that the property should be bought in for the benefit of the bondholders and Mortimer and Gilliam, and that a new company should be formed to take over the proposition, exchanging new bonds for the old bonds, similar in all respects to the bonds secured by the then existing mortgage, which the bondholders would accept in lieu of the securities held by them. Keiswetter, to whose bank the concern was largely indebted, personally guaranteed to pay the bondholders back interest on their bonds, and subsequently he did pay this back interest; but he paid it out of the funds of the company. In so far as the record disclosed, he has never paid a nickle for anything he as an individual now claims to own in connection with the corporation subsequently formed.

An action was instituted, the mortgage foreclosed, the property sold, and bid in by Mr. Bright Williamson. The

new corporation, which is the present corporation, known as the D. T. McKeithan Lumber Corporation, was formed. The money for the bid, the expenses of the foreclosure, including the fees of the officers of the Court and attorneys, and the charter for the new corporation, were paid for out of the funds of the company. In the transfer of the assets from the D. T. McKeithan Lumber Company to the D. T. McKeithan Lumber Corporation, there was shifting and dodging and so-called assignments and so-called interests from various parties to various parties; but shucking away all subterfuges, the plain truth is that, when the corporation was formed, it was merely a continuance of the other corporation, and no other intelligent conclusion can be had. The operation did not stop for a moment, the corporation continued for some time to use the books of the company as one running transaction. It used the company's bank account, it used the company's lumber, it used the company's receivables, carrying them into its surplus, and the only difference between the two was that one was called the company and the other the corporation. In so far as the relative interests of the parties before the Court are concerned, I find, and so hold, that their interests are identical. Technically they are possibly in law two separate entities, because the two corporations derived their functions from two separate and distinct charters; but casting aside technicalities, and looking to the substance, the corporations are one, with all the real interests of the stockholders therein identical. Neither Kieswetter nor Gilliam can claim that the stock interests were not half to Mortimer and half to Gilliam, because they are estopped from so claiming by their entire statements and conduct.

The charter of the new corporation provided for $300,000 of preferred stock and $300,000 common stock. It is clearly established by the testimony and by the admission of Kieswetter himself that the consideration for the stock of the new corporation was an exchange of the stock of the

old.   After the foreclosure sale had been had and the new corporation launched and ready for business, Kieswetter called Mortimer and Gilliam to his room at the hotel in Darlington to get their stock.   He had in his room one Henry Gumble, a lawyer from Columbus, Ohio, who had been his general adviser in all the matters leading up to the foreclosure and in the organization of the new corporation.   When Mortimer arrived in the room, Kieswetter began to harass him by the production of a so-called set of rules and regulations whereby the business was to be conducted in the future.   It seems that these rules and regulations had been prepared by Gumble; but they were never adopted by the stockholders and directors of the corporation, and had not been incorporated into its records, even up to the time of the trial of this cause.   Mr. Gilliam testified that the original draft had never been heard of since, and their purport would not be known with accuracy had not Mortimer taken the precaution to take a copy of them.   From admissions in the testimony of all parties, it is obvious that these rules and regulations were not intended as the working plan for the corporation, but were produced for the sole purpose of harassing Mortimer, and eliminating him from having any voice in the management of the business by placing him in a subordinate and humiliating position.   Mr. Mortimer admitted on the stand that the treatment he received at the hands of Kieswetter made him lose his temper, and he would have been less than human had not such been the case.

Some discussion arose as to what his duties were to be, and while no satisfactory explanation has been made in this regard, the evidence is convincing that he was to be in their employ and for such employment was to receive $3,000 per year, his house rent, lights, fuel, and telephone bill, which would reasonably amount to $1,600 per annum.

Mortimer has sued the corporation for his unpaid salary, and I find he is entitled to the $3,000, plus house rent, etc.,

amounting to $3,600 a year, less $250 salary paid him
for the month of March, 1916, and $150 house rent, etc.,
for the three months he occupied the premises, thus leaving
due him $3,200 on this account, for which I recommend
that he have judgment against D. T. McKeithan Lumber
Corporation.

Following the controversy respecting the rules and reg-
ulations, Mr. Mortimer demanded his stock in the new con-
cern. Kieswetter directed Gumble to get the stock book
and deliver Mortimer's stock to him; but, to Mortimer's
consternation, he received $47,500 common stock instead
of $150,000 to which he was entitled. It seems that in the
disposition of the stock without regard to the proportions
of stock between their former holdings and the new stock
Kieswetter delivered to each, Mortimer and Gilliam, only
$47,500 of the new stock. He appropriated the remaining
$205,000 personally. He had no stock of his own in the
D. T. McKeithan Lumber Company for which to make
an exchange in new stock. The Poston stock, in any event,
had belonged to Mortimer and Gilliam or had to go back
to Poston. Kieswetter personally had no shadow of a claim
to it, yet he took it and took it in cold blood, and he must
make restitution. Gilliam seems to have acquiesced in this
arrangement. Indeed, it is evident he was a party to it,
because as already stated, Gilliam's prime motive was to
eliminate Mortimer, so that he and his associates could
appropriate money, either for themselves or for the corpo-
ration, which justly belonged to the sinking fund for the
benefit of the bondholders. In explanation of his attitude,
he says in his testimony that he had confidence that Kies-
wetter would treat him right, and it seems that his confidence
was well placed, however weak the vessel may have been
to which he trusted it; for we find him subsequently get-
ting large blocks of stock for which he admits he paid ab-
solutely nothing.

I therefore find that the plaintiff, J. Mortimer, Jr., is entitled to 1,500 shares of the common stock of D. T. McKeithan Lumber Corporation, of which he has received 475 shares, leaving him short 1,025 shares, and I recommend that the defendant Emil Kieswetter be required to surrender into the corporation 1,025 shares of such stock, and that the corporation reissue and deliver the same to J. Mortimer, Jr.

Only $100,000 of the $300,000 preferred stock has been issued, and this is held by Ohio National Bank as collateral to its claims.

Almost immediately after the new corporation was put into operation, friction arose between Mortimer and Gilliam. Mortimer was in law to blame in this, if the Court sees fit to ignore the insults and indignities to which he was subjected. It was undoubtedly true that Gilliam in the most cold-blooded manner, had determined to do everything he could to rid himself of Mortimer, who was a menace to the schemes to get the better of the sinking fund and, through it, the bondholders. Matters came to an issue between them at an interview they had in the office when Mortimer accused Gilliam of intending to undertake to discharge him as soon as he (Gilliam) got back to Columbus, Ohio. Gilliam denied any such purpose and reminded Mortimer at the time of his having been hired for the year, but Mortimer's anticipations were well founded, for Gilliam sent a letter undertaking to discharge him and had in effect discharged him as soon as he reached Columbus. Moreover, Mortimer's claim for his year's salary is further justified by the fact that for more than a year he could get no employment in the lumber business, which he had followed since childhood, and which was the only business he knew.

After having been virtually kicked out of the corporation and having failed to get his rights in any respect, Mortimer brought the present suit. At the next annual meeting of the stockholders after the bringing of his suit, he undertook

to learn something of the manner in which the affairs of the corporation were being conducted. He and his counsel attended such stockholders' meeting and demanded in writing information to which he was entitled under the statute law of the State. By a purely partisan vote this information was denied him. If any doubt existed as to the character of Gilliam, Stein, and Kieswetter, the three directors and officers of the corporation, such doubt would be dissipated when what occurred at this stockholders' meeting is examined. Although, as above stated, Mr. Mortimer and his counsel, Mr. Coggeshall, made certain demands which were wholly within Mortimer's legal rights, all information of every kind was denied them, and the minutes of the meeting prepared by Stein and signed by Gilliam was surcharged and falsified as to what occurred. These minutes even included the unanimous ratification by the stockholders of all things done by the officers and directors during the year, although Mr. Mortimer and Mr. Coggeshall were present protesting with all the earnestness they could command. And to go one step further, when these minutes were disclosed and Mr. Coggeshall called the attention of Stein to the error in the minutes in a courteous letter, Stein preemptorily dismissed the matter by stating the minutes were a correct transcript of what had occurred. On cross-examination in the trial of this cause, he was forced to admit there could be no reconciliation between what actually occurred and his letter.

During the progress of the trial, counsel for the defendants proposed that there be an audit, and the audit was had, though, it must be said, under great difficulties. After having the proposition for an audit made by counsel for the defendants, the defendant corporation, through its several officers, placed every difficulty it could in the way of such audit. They refused to produce the records for the Judge of Probate, whereupon the Judge of Probate certified the facts to the Judge of the Fourth Circuit to order the

records produced.   After this was done and after an auditor had come from New York, every impediment was placed in his way.   He himself stated that he repeatedly asked for records which the officers claimed they could not find, which the auditor himself found as soon as he went to the office of the corporation.   Every subterfuge and evasion was employed, including the denial of the Ernst & Ernst first audit, and the actual work of the audit was delayed and hampered to such a great extent that it involved a needless waste of time and money.

In this connection, however, though I have no words of condemnation too strong for the conduct of the defendants, it is a pleasure to state the attorneys for the defendants did everything in their power to aid the auditor and the auditor so testified.

When the records were produced and the audit had, they disclosed personal greed and corporate mismanagement that was appalling.   In speaking of personal greed, I have particular reference to the salaries voted themselves by Gilliam, Stein, and Kieswetter, when at the meeting of the directors Gilliam's salary was raised from $3,600 a year to $10,000 a year, and Kieswetter and Stein were voted salaries, respectively, of $7,200 and $4,800.   It is true that Kieswetter and Stein have never drawn these salaries, but it is equally true that they intended so to do, and only changed their minds and entered a claim that the salaries were voted them to pay for the McCown-Clark timber when they found themselves run into a corner.   In fact, in the testimony taken at Columbus, Ohio, which has been brought largely into the present record by cross-examination, Stein's testimony having ben taken prior to Kieswetter by two days, Stein denied that salaries were voted him and Kieswetter for the purpose of paying for the McCown-Clark proposition.   Two days later, Kieswetter testified they were.   In other words, my conclusion is that they were merely trying to patch their fences after having been virtually caught, and there is no

denial anywhere that Gilliam has not continued to draw the wholly unwarranted salary of $10,000 a year for mismanaging this property. Moreover, there has been no rescission by the directors of the salaries voted to Kieswetter and Stein, though the McCown-Clark timber has been paid for long since.

By corporate mismanagement, I have particular reference to Gilliam's conduct of the affairs of the corporation. During the period of his administration covered by Mr. Timm's audit he has depleted the standing timber, which is the raw product and only essential item in the conduct of a lumber business, by over 39,000,000 feet, and at a large loss, while all the witnesses, including the witnesses of the defedants, have testified that, during the period in question, the lumber industry has enjoyed the most prosperous time in its history. Based on the result of the Timm audit, Anderson characterizes Gilliam's operation as unsuccessful, Mikle John, charactizes the operation as unsuccessful states he is familiar with the property, and that Gilliam should have made a profit of approximately $200,000; W. R. Bonsal, a man of large affairs and familiar with the lumber industry, characterizes Gilliam's administration as rather rotten. The testimony shows, and it is Gillim's excuse for the results obtained by him, that the corporation has been shut down by the high water at a cost of from $400 to $600 per day. The testimony further shows that these shutdowns could have been avoided by the simple expedient of raising a short trestle at Herring Creek at nominal cost. Gilliam seems to have paid no attention whatever to the operations in the woods, but, on the contrary, to have left them wholly to subordinates. He gave no notice to the bondholders of the completion of the cutting of any of the tracts, as required by the mortgage, not even knowing what tracts had been cut and what had not. I can see nothing to justify his administration.

Had Mortimer had any voice, or, rather, if he had not been denied a voice in the corporation, as a mere stockholder, he could not be heard to complain; but when Kieswetter and Gilliam ejected him, denied him all information and access to the property, and warned him to keep away under threat of prosecution, there could be no clear proof that they intended to assume the responsibility of their acts, and they must be held liable therefor. During the period in question they cut 39,198,986 feet of timber. There is little or no variation in the testimony. Had they let this timber stand, all witnesses agree it would have been worth from $7 to $8 a thousand. Accepting the actual count and figuring its value at $7.50 per thousand, they have depleted the standing timber assets of the corporation in the sum of $293,992.39. In the audit of Mr. Timm they have been charged for this timber at the average price of $1.96 per thousand, or $76,-830.01. They paid into the sinking fund at $2.50 a thousand, or $97,997.46. They have made an apparent profit according to Mr. Timm, of $32,461.99. Deducting the sum of these two charges and the apparent profit, which is in the treasury of the corporation, from the depletion of timber, I find that the administration of Galliam, Kieswetter, and Stein, has depleted the corporate assets through the consumption of standing timber alone in the sum of $86,702.93. Having assumed all responsibility for their operation and having been guilty of culpable negligence in the conduct of such operations, I find, and so hold, that they are personally liable for this amount, and recommend that the corporation have judgment against them in the sum of $86,702.93.

In this connection, I should state that a motion was made before me to ammend the complaint for the purpose of allowing the pleadings to conform to the proof, so that the corporation might have judgment against its co-defendants in any sum found against them. Counsel for the defendants in opposing this motion admitted that the plead-

ings were broad enough already to cover this feature, and I therefore granted no order.

When the corporation absorbed the assets of the company on March 6, 1916, it absorbed, among other assets, 4,820,940 feet of lumber manufactured and on the yard, for which it was charged in writing up the books the sum of $72,214.12, at the admittedly arbitrary price of $15 per thousand.  In arriving at the apparent profit of $32,461.99 the lumber is charged to operations at such arbitrary figure, though all parties admit it was worth a great deal more, and would be worth no less than $30 per thousand at the time of the trial, had it not been converted.  While the rule as to conversion is that the Court may find in any sum from the lowest not exceeding the highest price, it is probably true that this lumber was sold from time to time at less than the maximum price, and I doubt whether it would be equitable to charge the highest price, although Kieswetter and Gilliam are in no position to complain should such be done, in view of their arbitrary conduct.  However, to do equity to all parties I venture to think this lumber should be charged to the operations at the average selling price found by Mr. Timm, of $23.99, or $115,654.37.  By reason of the same principles found by me in respect to the standing timber, Kieswetter and Gilliam have wasted this item of property, after allowing a deduction for which the operation was charged, in the amount of $43,340.25. The corporation should have judgment against them for this additional sum, and I so find and recommend.

Gilliam took out in his own name a patent for the treating of gum lumber for the market, and this patent was assigned by him and became the property of the corporation known as the Gilliam Process Company, the stock of which was owned by Gilliam, Poston, and Mortimer.  Gilliam was in possession of the records of the Gilliam Process Company, of which he was president and managing officer.  He abstracted from the records of the Gilliam Process Company

the assignment by him of the patent in question to the Gilliam Process Company, and assigned this patent to a creature of his own, incorporated under the laws of the State of Maine, known as the Nu Pro Gum Company. The stock of the Nu Pro Gum Company was issued to Gilliam, Kieswetter and other associates and friends. In connection with the Nu Pro Gum Company, in charges for its incorporation, for attorney's fees, and litigation, expenses have amounted to $832.73. These were paid by the lumber corporation at the instance of Gilliam and with the connivance of Kieswetter, notwithstanding the fact that the lumber corporation had no interest whatever by stockholding or otherwise in this Nu Pro Gum Company. In other words, Gilliam and Kieswetter organized this company for the personal benefit of themselves and their associates and used the corporate funds to pay the fiddler. This was a direct diversion of corporate funds for the benefit of its officers, and they are personally liable for such diversion. I therefore find, and so recommend, that the corporation on account of this item have judgment against its codefendants, Gilliam and Kieswetter, in the sum of $832.73.

The salaries voted Stein and Kieswetter should be rescinded on the records of the corporation, and no sum whatever should be paid to them or either of them on this account. Since there was no justification, especially from practical results, for the salary voted by the directors to Gilliam of $10,000 per year, and since he and Kieswetter were guilty of culpable and corporate exploitation for their personal benefit in the voting of these salaries, the corporation should have restitution. Up to August 31, 1919, Gilliam had been paid $18,866.63 for two years and eleven months in excess of the salary to which he was entitled of $3,600 per year, and I recommend, and so find, that the corporation should have judgment against him and Kieswetter on account of this item in the sum of $18,666.63.

In a conference in the office of Kieswetter in Ohio National Bank between him and Poston, it seems that each of these parties desired an audit, in 1917, of the operations of the defendant corporation. They thereupon entered into an agreement that Poston would contribute $250 to the costs of the audit, that Kieswetter would contribute a like sum, or so much as might be necessary for completion, and that the auditor would be mutually selected by the two and make his report to both. Without consulting Poston, Kieswetter employed W. R. Langdon to make the audit. What his motives were in so doing, whether he did not want Poston to know of the corporate mismanagement or not, does not appear; but it is a fact that when this audit and the bill therefor was submitted, Kieswetter refused to allow Poston to see it, and saddled the bill amounting to $1,482.39 on the corporation, and paid it out of the corporate funds. I find this division of corporate funds for the personal benefit of Kieswetter wholly unwarranted, and I recommend that the corporation have judgment against him on this account in the sum of $1,482.39.

Subsequently, it seems that the directors of Ohio National Bank desired an audit and report on the affairs of the corporation and they employed Ernst & Ernst, certified public accuntants, to make such audit. Ernst & Ernst made their report to the directors of Ohio National Bank and rendered their bill against such bank. When it came to the paying of the bill, Ohio National Bank paid a small part, and the remainder of this bill, amounting to $2,085.15, was also saddled on the corporation. It will be observed that when any bills were to be paid, whether it was Nu Pro Gum Company, audits, or what not, the corporation was made, to use a homely but apt expression, the goat. I find this item an unwarranted diversion of corporate funds, and recommend that the corporation have judgment against its codefendants on this account in the sum of $2,085.15.

Having taken Mortimer's stock and having denied Mortimer all information and access to the affairs of the corporation, Kieswetter and Gilliam are directly responsible for the present litigation. The corporation is in no sense responsible for the present situation, except through the outrageous conduct of its officers. Indeed, this institution, aside from the salary claimed by Mortimer from the corporation and which should be allowed him, is a personal fight on Mortimer by Kieswetter and Gilliam for their personal benefit. Nevertheless, although they are wholly to blame for the situation and the corporation is the innocent victim of their cupidity and' misconduct, they have further saddled on the corporation the entire expense of this litigation, including their expenses for the attending of the trials. Mr. Timm's report shows that up to August 31, 1919, they had spent on this account $3,756.45. In Gilliam's testimony, at pages 184 and 185, when pinned down as to the item of $150 which he wrote Dages was for legal expenses, but which he did not wish to appear as legal expenses on the books, he now explains as being a part of the Mortimer trial expenses. Adding this item to the amounts found by Mr. Timm's audit, I find a diversion of corporate funds up to August 31, 1919, for litigation, for which Kieswetter and Gilliam are alone responsible, in the sum of $3,906.45, and I recommend that the corporation have judgment against them for such amount.

In addition, the Pace & Pace audit for Mr. Timm has cost the sum of $5,284.02. The cost of this audit have been paid half and half by Mortimer and the corporation. Kieswetter and Gilliam would pay nothing. In so far as the sums paid by the corporation are concerned, I recommend that the corporation have judgment against Kieswetter and Gilliam for such amounts; that is, the sum of $2,642.01. It was the understanding of counsel that the costs of this audit should be taxed as might appear equitable. I recommend that in addition to his regular taxation of costs that

J. Mortimer, Jr., have judgment against the defendants
for the sums advanced by him, amounting to $2,642.01, and
that such judgment provide that Kieswetter and Gilliam are
primarily liable therefor.

In the scope of this report, especially in view of the fact
that it has been necessary to treat of the matters hereinabove
detailed, and of the consequent length to which I have been
forced to go, I do not deem it necessary to pass on the ad-
missibility of testimony, other than to give my reasons for
the ruling out of testimony of Emil Kieswetter taken *de bene
esse*. At a reference held by me, extending over several
days while the defendants were examining their witnesses
on the stand Kieswetter was in open Court. Had he wished
to go on the stand he had ample opportunity so to do. To
the surprise of every one, he left South Carolina, and re-
turned to his home in Ohio. Counsel for the defendants
frankly stated in open Court that Kieswetter had pursued
this course against their advice, and subject to their warning,
in effect, that he was leaving at his own peril. Subsequently
his testimony was taken *de bene esse* at Columbus, Ohio,
before a notary public, and defendants undertook to incor-
porate it in the record. I ruled it out for the reason that
Kieswetter had in fact left the Court at his peril, and against
the advice of his counsel, and upon, the further ground
that he had refused to answer questions, or had answered
them as he chose, before a notary in Columbus, who was
without power to compel answers in any respect. As I
take it, the right to cross-examine is a substantial right of
which no litigant should be deprived at the whim of a wit-
ness, and the records show that he had failed to answer
questions or that he answered them according to his own
wishes and desires. Plaintiff has in effect been deprived
of a substantial right, and he should not be made to suffer
therefor. For these reasons I have excluded this testimony.
I do not hesitate to add, however, that I have read the tes-
timony, and it would not make the slightest difference in the

conclusions reached by me in this report.   In fact, it further confirms my impressions.

There is no escape from the conclusion that the affairs of the corporation have been grossly neglected and mismanaged by the officers of the corporation, whose paramount object seems to have been to exploit it for their personal benefit in flagrantly and fraudulently diverting its funds for their personal uses.   I therefore recommend that, pending a final disposition of this litigation a receiver be appointed to take over the business and for the purpose of protecting it for the benefit of its stockholders and creditors, and suggest that the receiver be directed and required to make further investigation with a view to recovering of Kieswetter and Gilliam such funds as may have been diverted from the corporate treasury for their personal benefit, or through corporate mismanagement, in accordance with the principle herein announced, and, in any other respect, that may be found by him since August 31, 1919.

The circuit decree was as follows:

This case came before me on exceptions to the report of the Probate Judge, Acting Master.

In July, 1911, D. T. McKeithan Lumber Company was organized and chartered under the laws of the State of South Carolina, with a capital stock of $200,000.00, or 200 shares of common stock of the par value of $100 per share.   There was issued $300,000 in bonds, which were owned and held by J. M. Barr, D. T. McKeithan, and W. R. Bonsal, and were secured by a mortgage of the company to the Fidelity Trust Company, of Baltimore, Md., as trustee, covering its mill plant, practically all of its standing timber and real estate and certain other items of property.   Of the capital stock of the company, E. M. Poston, as trustee for the New York Coal Company, owned and controlled 1,050 shares; J. Mortimer, Jr., 400 shares; J. M. Barr, D. T. McKeithan, and W. R. Bonsal, 350 shares; and R. L. Gilliam, 200 shares.

Upon the organization of the company, it took over, as purchaser, from J. M. Barr, D. T. McKeithan, and W. R. Bonsal, who became the owners of the $300,000 of bonds of the company, practically all of the property holdings in South Carolina of the old Williams & McKeithan Lumber Corporation, of Virginia, including the mill plant and equipment, real estate and standing timber, and this corporation was in turn the successor to the Williams & McKeithan Lumber Company.

After the D. T. McKeithan Lumber Company had been operating for a short time, suit was commenced by the company against the bondholders in the United States District Court for the Eastern District of South Carolina, on account of an alleged shortage in standing timber and for other causes. Pending this litigation an injunction was issued restraining the company from disposing of its manufactured product, which, together with adverse market conditions, which were later aggravated by the outbreak of the World War, kept the plant closed down for considerably over a year. During the life of the company, up to the early part of 1915, it had contracted debts amounting to a little over $100,000, for which it had outstanding notes of practically $78,000 to the Ohio National Bank, $9,000 to the City National Bank, and $15,000 to the New York Coal Company, all of the Columbus, Ohio, and a small part of the indebtedness was represented by open accounts. In the same time it had reduced the bonded indebtedness $40,000, had accumulated on hand about 5,000,000 feet of manufactured lumber, valued at $18 per thousand feet, outstanding accounts and bills receivable amounting to $20,000, and two tracts of land in Lee County, no part of which property was covered by the mortgage given to secure the bonds of the company.

Early in 1915, owing to the shutdown of the plant for over a year and adverse market conditions, the company had fallen behind in meeting the interest and payment on

the bonded debt, and foreclosure was threatened by the bondholders. The plaintiff, J. Mortimer, Jr., and the defendant R. L. Gilliam, who had practically all of their capital invested in the company, became apprehensive of losing their investments, and, after market conditions had improved and the outlook for the lumber business had become much brighter, sought to bring about some agreement among the bondholders and the larger unsecured creditors, whereby the company could resume operations, pay off its indebtedness, and save the stockholders. In this undertaking they were favorably received by all of the parties. After one or more tentative agreements had fallen through, they met with the representatives of the only three large unsecured creditors, the Ohio National Bank, City National Bank, and New York Coal Company, at Columbus, Ohio, and after a failure to execute the first proposed agreement, of May ——, 1915, the second agreement of May ——, really May 26, 1915, was executed by all parties. This agreement, however, was not to become effective and binding upon the parties unless J. Mortimer, Jr., and R. L. Gilliam should secure from the bondholders their consent to the terms of the agreement, and that the unincumbered assets might be used by the company to pay or compromise its unsecured debts and should also secure from the said bondholders a modification of the mortgage of the company to the Fidelity Trust Company, as trustee, whereby it could continue to operate its plant and business and cut and mill its timber. It being understood by all parties that it was impracticable to operate successfully under the mortgage as it then was, as it required the company to pay its entire interest on the bonds and retire $30,000 of bonds annually, regardless of fire, wind, high water, strikes, market conditions, or other contingencies which might make it impossible to operate and thereby acquire the funds for such purposes.

In this May ——, or May 26, agreement the New York Coal Company not only contracted to compromise its claim along with the two banks, but also agreed to turn over 1,044 shares of the capital stock of the company to the Ohio National Bank, to be held by it as trustee pending the negotiations with the bondholders, and in the event that the bondholders declined to agree to the terms of the contract and modify the terms of mortgage as required, then, and in that event, the said 1,044 shares of stock were to have been returned by said bank to the New York Coal Company; or if such contract was entered into, and when the agreement with the bondholders was duly executed and signed, the said stock was to have been turned over by the Ohio National Bank to J. Mortimer, Jr., and Robert L. Gilliam equally, or to such persons as they may nominate.

Immediately after the execution of the May —— contract, Mortimer and Gilliam arranged for a meeting of the bondholders, which meeting was held June 5, 1915, at the offices of . Willcox & Willcox, at Florence, S. C. This meeting was attended by Mortimer and Gilliam, representing themselves, and the D. T. McKeithan Lumber Company; Emil Kieswetter, president of the Ohio National Bank, representing the two banks and the New York Coal Company; Messrs. Barr and Bonsal, with their attorney, Mr. P. A. Willcox; and George E. Dargan, attorney in fact for D. T. McKeithan. Owing to unpleasant relations between the bondholders and E. M. Poston, president of the New York Coal Company, on account of the litigation on in the Federal Court, they declined to enter into any agreement unless the New York Coal Company and E. M. Poston were entirely eliminated and would surrender the remaining 6 shares of stock and the claim of $15,000. They did, however, enter into a tentative contract on that day in which they agreed to all of the essential provisions of the May —— contract, and to execute a new mortgage with such modifi-

cations as were contemplated in said contract. And they further agreed to surrender to Messrs. Mortimer and Gilliam their 350 shares of the capital stock of D. T. McKeithan Lumber Corporation and certain notes of the said Mortimer and Gilliam, which they held with their stock as collateral. This contract was delivered upon what was termed a gentleman's agreement—that it was not to be binding on the bondholders unless the New York Coal Company should surrender its remaining 6 shares of stock and its claim against the company. Kieswetter and Gilliam agreed to undertake to get the stock and to have the claim surrendered, and it was not long before they reported to the bondholders that such had been done and asked for another meeting, which was held July ——, 1915, at the offices of Willcox & Willcox, with the same parties present as were at the June 5th meeting. At this meeting another contract was entered into with possibly some slight changes to which all parties appeared to have agreed, and on August 18, 1915, the modified mortgage was executed making the changes contemplated in the May contract.

Upon the execution of the preliminary contracts, the attorneys for the bondholders turned over to Mortimer the notes which they held with stock as collateral, and also the 350 shares of stock owned by the bondholders, who carried out the agreement with Gilliam and surrendered the stock to be reissued $7,500 to himself and $27,500 to Gilliam, which, added to the $40,000 and $20,000 stock already held by them, respectively, made them owners of $47,500 stock each, besides the Poston stock which Kieswetter held for them.

Mortimer and Gilliam having secured from the bondholders the contract agreeing to the terms of the May —— contract, and having also secured the modified mortgage required, the contract of May —— became binding and operative upon all the parties thereto.

The mortgage contained a clause providing for a sinking
fund for the payment to the trustee on or before the 20th
day of each and every month until all the bonds issued
thereunder had been retired of a sum of $2.50 per thousand
feet for all timber cut and sawed into lumber, to be used
for the payment of interest and the retirement of the bonds
as they became due.     After ' execution of the modified
mortgage, and the mill, railroad, and logging equipment
had been rehabilitated, operations were resumed about No-
vember 1, 1915.    The Judge of Probate held that during
that month Gilliam approached Mortimer with the prop-
osition that they should not include in their reports to the
trustee certain grades of lumber cut, amounting to not less
than 25 per cent. of the entire cut of the mill.    To this
Mortimer declined to accede, which brought about unpleas-
antness between the two.    That only a short time thereafter
Gilliam came down from Columbus and informed Mortimer
that E. M. Poston was claiming that the stock turned over
to Kieswetter for them under the May contract should be
returned to him after debts of the company were paid, and
had refused to turn over the remaining 6 shares of stock
unless Kieswetter would sign a receipt acknowledging said
claim.    That Kieswetter had declined to do this and had
sent him down to communicate the situation to the bond-
holders.    That he (Gilliam) had told Mr. Barr of Poston's
claim and that Barr was much incensed and announced
that the only course for the bondholders to pursue under the
circumstances was to have the trustee foreclose the mort-
gage upon which he said a default then existed.    He pro-
ceeded to tell Mortimer of a plan which he had suggested
to Barr, and to which Barr had agreed, for the organization
of a new corporation to take over the assets of the D. T.
McKeithan Lumber Company after the foreclosure upon
the same terms and conditions as then existed.    That part
of the Judge of Probate's report finding that Gilliam had
proposed that they should not report to the trustee certain

grades of lumber cut was excepted to by defendants. The positive testimony of the plaintiff on this subject, which was not disputed, and the subsequent conduct of R. L. Gilliam, convinces me that the finding is correct, and the exception must be overruled. Nor am I prepared to hold that the Poston letter, of November 15, 1916, was not used by Gilliam and Kieswetter for the purpose of inducing the bondholders to foreclose the mortgage with the hope of eliminating Mortimer's claim to one-half of the Poston, or New York Coal Company, stock and enabling them to remove him from the service, and thus to carry out the plan to withhold from the monthly reports to the trustee certain grades of lumber as had been previously suggested to Mortimer and which they, after his discharge, did not report until forced to do so by the bondholders. In the light of subsequent developments, however, I am satisfied that Gilliam and Kieswetter had determined to get rid of Mortimer. Whether it was predetermined or not, however, the fact is when the reorganization was had, Gilliam and Kieswetter proceeded to manage it to suit themselves without the slightest regard for Mortimer or his holdings. Among other things, they increased the common stock from $200,000 to $300,000 without the payment into the company of any new money, and issued to Kieswetter $204,-500 of stock, a controlling interest for which, according to his own testimony, he paid absolutely nothing. Mortimer's holdings were thereby reduced from a half interest (to which he was entitled) to a minority stockholder. And thereafter the treatment accorded the minority stockholders by the majority was the most arbitrary and highhanded that I have ever heard of in this State. With the understanding that in the new organization his interest and that of Gilliam would be the same, and that the banks and bondholders should be protected as before, Mortimer went to work with Gilliam to perfect the new arrangement.

After negotiating with the stockholders for the preservation of the rights and interest of all parties connected with the old corporation in the new corporation, which was to be organized to take over the property after the foreclosure, the mortgage was foreclosed, and the D. T. McKeithan Lumber Corporation was organized and chartered with $300,000 common stock and $300,000 preferred stock, and took over all the property of the D. T. McKeitham Lumber Company, except two tracts of real estate in Lee County, which it was admitted in argument were the same that were to have been conveyed to the Ohio National Bank under the May —— contract, and which, before the foreclosure, were conveyed by the company without consideration to Bright Williamson; by him to R. L. Gilliam, who, in turn, made a deed for them, which, according to testimony of Emil Kieswetter, is now being held in escrow by the Ohio National Bank.

The property of the company sold under foreclosure proceedings was bid in by Bright Williamson, who promptly transferred his bid, which was paid out of funds of the old company, to the D. T. McKeithan Lumber Corporation for $299,500 of its common stock, $100,000 of its preferred stock, and $260,000 of its bonds, to be secured by a mortgage of the corporation on the property sold—these bonds being the same number and denomination, and bearing the same rate of interest, as the outstanding bonds of the D. T. McKeithan Lumber Company, were intended to be substituted therefor. Immediately after making this exchange, Mr. Williamson turned over to J. M. Barr, D. T. McKeithan, and W. R. Bonsal, the bondholders of the old company, these bonds. The $100,000 preferred stock he turned over and assigned to the Ohio National Bank to be held by it as collateral to its claim of $78,000 against the old company. Of the common stock, there was issued to Mortimer and Gilliam, each $47,500, and to Kieswetter, $204,500, the remaining 5 shares being held by Robert L. Gilliam, Emil

Kieswetter, T. C. Cork, Henry Gumble, and George E.
Dargan; the latter three only holding qualifying shares.
Why this complicated method of transferring the rights of
the parties from one corporation to the other was resorted
to does not quite appear.   But in the transaction it is quite
evident that Mortimer did not get the number of shares of
stock to which he was entitled.   Contentions as to just
what the agreement was in regard to how the stock in the
new corporation should be issued are conflicting; but, from
the testimony of both plaintiff and defendants, I unhesitat-
ingly find the agreement to have been that all parties should
have the same interest in the new corporation as they had
in the old.   Certainly, under the circumstances, no other
agreement would have been just or equitable.   I fully
concur with the Judge of Probate in his finding that, "casting
aside technicalities and looking to the substance, the corpo-
rations are one, with all the real interest of the stockholders
therein identical.   Neither Kieswetter nor Gilliam can claim
that the stock interests were not half to Mortimer and half
to Gilliam, because they are estopped from so claiming by
their entire statements and conduct."   And I concur fur-
ther in his finding that there should have been issued to
the plaintiff, James Mortimer, Jr., on March 6, 1916, 1,500
shares of common stock of the D. T. McKeithan Lumber
Corporation, instead of 475 shares, the number actually
delivered to him, and all exceptions to this part of his
report are overruled.

The defendants contend that Mortimer was to have none
of the Poston stock until the discharging of the debt to
Ohio National Bank, which has never been discharged.   The
Probate Judge finds otherwise.   Whichever view may be
correct became of no importance when the new corporation
was organized, for Kieswetter, who managed the entire
affair for the bank, had $100,000 of preferred stock issued
as collateral to the bank's debt, and the bank accepted and
now holds the new collateral.   If, therefore, the defendants

are correct in their contention that Mortimer was to have none of the Poston stock until the bank's debt shall have been discharged, but that in the meantime the stock should be held as collateral, when the bank accepted the preferred stock as its collateral, it released the common stock and Mortimer became entitled to his part. I entirely agree with the conclusion of the Probate Judge as to Kieswetter's title to the common stock which he appropriated and converted to his own uses, including Mortimer's stock, without any valid claim thereto. He had none.

I hold that the Ohio National Bank is entitled to retain the $100,000 preferred stock of the D. T. McKeithan Lumber Corporation, assigned to it as collateral to its claim of $78,000 against the D. T. McKeithan Lumber Company.

It is admitted by all parties that after the organization of the defendant corporation, the plaintiff was employed in some capacity, and there seems to be but little controversy as to his compensation. The defendant Gilliam contends, however, that this employment was by the month, while the plaintiff and his brother, S. K. Mortimer, who overheard a conversation between the plaintiff and Gilliam as to the terms of the employment, both say that it was by the year, and in this they are corroborated by the testimony of the defendant Kieswetter. I therefore affirm the finding of the Judge of Probate that the plaintiff was employed at a salary of $3,000 a year, his house rent, light, fuel, and telephone bill, which would amount to $600, making $3,600 a year. From this should be deducted $250 salary paid him for the month of March, 1916, and $150, house rent, etc., for three months he remained on the premises, leaving due him by the corporation $3,200 on this account and interest.

A short time after Mortimer had been deprived of the control of his share of the Poston stock and a large part of his individual stock, discharged from the service of the corporation, denied access to any and all of the corporate property, books, or records, and refused any information

whatever about the business and workings of the corporation, Emil Kieswetter, F. L. Stein, and R. L. Gilliam, having under their control practically all of the stock of the corporation, with the exception of the 475 shares issued to Mortimer, reduced the number of directors from five to three, elected themselves the three directors—Gilliam, president and general manager; Kieswetter, secretary and treasurer; and Stein, assistant secretary and treasurer. Some time in the month of October, 1916, only a few months after this had been done, at a directors' meeting held in Columbus, Ohio, they voted to Emil Kieswetter a salary of $7,200 a year; to F. L. Stein, $4,800; and to R. L. Gilliam an increase in his salary from $3,600 to $10,000 a year. This was not only irregular and improper, but the salaries were excessive for the work being done. I do not believe they would have been voted had Mortimer remained with the corporation. Kieswetter and Stein subsequently claimed that their salaries were created for the purpose of paying for a tract of timber known as the McCown-Clark timber, a deal closed the following year, and they have never drawn theirs salaries; but there has been no rescission of them by the board of directors of which they constitute a majority, although it is admitted that the McCown-Clark timber has been paid for long since. I therefore hold that the salaries voted to Kieswetter and Stein should be rescinded on the record and should not be paid to them. I hold further that there was no justification for the salary voted by the directors to Gilliam and drawn by him in excess of $3,600 per annum, and the corporation should have restitution therefor. Up to August 31, 1919, at which time the books were audited under order of Court, Gilliam had been paid $18,666.65, in excess of the salary to which he was entitled, and the corporation should have judgment against him for said amount. The plaintiff contends that these salaries were excessive and unjustified, and, as above indicated, I so find and hold. The plaintiff further contends that all directors

who voted these salaries, and with whose knowledge and consent Gilliam was drawing his, are personally liable for the excess upon the ground that no director had a right to vote the corporate funds into the pocket of a codirector. Stein is not a party to the suit, and the Court has no jurisdiction of him. Kieswetter is a party, and the Probate Judge adopted the contention of the plaintiff and held him liable, together with Gilliam. I am constrained not to follow to this extreme, and sustain defendants' exception to this extent to the finding of the Probate Judge.

When the McCown-Clark timber was purchased, Kieswetter, Stein, and Gilliam took title in their individual names; when it was paid for, they conveyed it to the corporation, but without renunciation of the dowers of their respective wives. They say, at least Stein so explains, that a lawyer of Columbus, Ohio, advised that no renunciations were necessary. The error of such advice is patent, and I hold that the corporation is entitled to a proper conveyance with renunciations of dowers of the wives of the three.

In 1917, Kieswetter and E. M. Poston, both desiring an audit of the affairs of the D. T. McKeithan Lumber Corporation and of the D. T. McKeithan Lumber Company, agreed in writing that such should be made and paid for, $250 by E. M. Poston, and the balance by Kieswetter, with the understanding that an auditor should be selected satisfactory to both and that each should be furnished with a copy of his report. Contrary to this understanding, Mr. Kieswetter admits that he employed an auditor of his own selection without consultation with Poston, had the audit made, declined to furnish Poston with a copy of the report, and paid for the audit, $1,482.39, out of the corporate funds. I find and hold that this audit was made for the personal gratification of Kieswetter, and that there was no justification for the use of the corporate funds in payment therefor, and that the corporation should have a judgment against Kies-

wetter for this amount, with interest from the date of payment.

I do not think, however, that the same principle applies to the payment by the corporation of $2,085.15 for the Ernst & Ernst report, as this report appears to have been made for the purpose of securing necessary credit from the Ohio National Bank, and, for this reason, I cannot concur in the finding of the Judge of Probate that the corporation should have judgment against its codefendants, Kieswetter and Gilliam, for this amount.

While the D. T. McKeithan Lumber Corporation was operating under the Poston management, Poston, Mortimer, and Gilliam had taken out in the name of Gilliam a patent of a process for the treatment of gum lumber and organized a corporation known as the Gilliam Process Company, in which they owned the entire stock, and had this patent assigned to this company. The fact that a patent will not be granted to a corporation explains why this patent was taken out in the name of R. L. Gilliam. It was contemplated that the stockholders should realize a good profit from this corporation by selling to the manufacturers of gum lumber the right to treat their lumber by this process. Soon after Mortimer had been discharged by the D. T. McKeithan Lumber Corporation, it was discovered that Gilliam, Kieswetter and Stein had organized the Nu Pro Gum Company, chartered under the laws of the State of Maine, with a capital stock of $200,000, the most of which was owned by Gilliam, and with the exception of possibly a few shares owned by two outside parties, the balance was owned by Kieswetter and Stein. These three were elected directors and officers of the company, and Gilliam who was president and in charge of the Gilliam Process Company, took from the records of the company the assignment by him of the patent and reassigned it to the Nu Pro Gum Company. Upon the discovery of this, the Gilliam Process Company brought suit against Gilliam and the Nu Pro Gum Company

for the patent, and pending this suit the patent was reassigned to the Gilliam Process Company, after which the Nu Pro Gum Company seems to have been abandoned.  During the life of the Nu Pro Gum Company it had contracted debts to the amount of $832.73 being the expenses of incorporation, litigation, and attorneys' fees, which, under the direction of Gilliam, were paid by the D. T. McKeithan Lumber Corporation.  This being a diversion of corporate funds, the Judge of Probate recommended that the corporation have judgment against Gilliam and Kieswetter for this amount, and I sustain this finding against Gilliam, but do not think the evidence is sufficient to bind Kieswetter, and therefore overrule the finding against him.

During the period from March 8, 1916, to August 31, 1918, both inclusive, covered by the Timm audit, the corporation cut 38,198,986 feet of its standing timber at an apparent profit of $33,461.99.  The management absorbed into the new business and used 4,820,940 feet of manufactured lumber on the yard when it assumed control.  The Probate Judge finds that Kieswetter and Gilliam, having assumed all responsibility for their operations, were guilty of culpable negligence in the operation of the corporation, and recommends that they be held personally liable for waste in the cutting of timber in the sum of $86,702.93, and waste of manufactured lumber taken over by the new corporation from the old company in the sum of $43,340.25, or $130,-043.18, in the aggregate.  I have studied the testimony carefully and cannot concur in this view.  Before the officers could be personally liable, it must appear that they were either grossly negligent in management of the business, or were guilty of wilful destruction.  They, no doubt, made many mistakes; but it is much easier, in the light of subsequent events after things have actually happened, to say what should have been done than it is to know what shall be done in the present when the future is unknown and conditions uncertain.  Especially is this true in the lumber

business, and more particularly when the timber must be cut from swamps subject to overflows such as in this case. Not only weather conditions and high water, but labor and transportation conditions during the war, and many other elements, entered into the operation of this plant. So I do not think the testimony warrants the conclusion that the directors should be held liable for these amounts, and must overrule the recommendations of the Probate Judge and sustain the exceptions as to these items.

In view of the attitude of Kieswetter and Gilliam toward Mortimer in not allowing him the amount of the stock he was entitled to in the reorganization, in the peremptory dismissal of him from the employ of the company, in deny-ing him and his attorneys all information about the corporate business, which as a stockholder he was entitled to have under the laws of this State, in their utter disregard for the rights as a stockholder in the conduct of the business, and in the many other acts of hostility, I do not think the corpo-ration is responsible for this litigation, but that Kieswetter and Gilliam are. I therefore concur in the findings of the Probate Judge that they should be required to pay the costs and expenses of same. While the testimony was being taken, counsel for the defendants proposed that an audit be made, and that "the Judge of Probate shall make such investigations personally, or through any agency which he may desire, and shall employ such assistants and accountants as he may require for his enlightenment in determining the issues in this case, and that the costs of such audit be paid one-half by the plaintiff and one-half by the defendant corpo-ration, and that the prevailing party tax the amount so paid as costs, according to the rules in equity in taxation of costs. This audit was made, though under very great dif-ficulties, owing to the delay and neglect on the part of de-fendants in turning over the necessary books and records of both the D. T. McKeithan Lumber Company, and the D. T.

McKeithan Lumber Corporation, which were in their exclusive possession and control. In one instance, at least, before Mr. Timm, the auditor appointed by the Court, arrived, they refused to produce the records in violation of the order of the Judge of Probate and withheld them until this fact was certified to the Judge of the Fourth Circuit who ordered them produced. After the auditor came he was greatly hindered and delayed in his work by the unpardonable neglect and delay in producing documents required and demanded by him. A prompt delivery of these records would have greatly facilitated the auditor's work and materially reduced the cost thereof. Mortimer and the corporation paid for this audit, $2,642.01 each, or together, $5,284.02. This should be paid by Kieswetter and Gilliam, and the corporation should have a judgment against them for the amount of $2,642.01, paid by it, and Mortimer should have a judgment against the defendants, Kieswetter, Gilliam, and the corporation for the $2,642.01 paid by him, with Kieswetter and Gilliam primarily responsible therefor and interest.

Through the management of the defendants Kieswetter and Gilliam, the defendant corporation has been required to pay the entire expense of this litigation, including defendants' attorney's fees, their personal expenses and those of their witnesses in attending trial, which Mr. Timm shows in his report amounted, up to August 31, 1919, to $3,756.45, and Gilliam admitted in his testimony that the item of $150, which he had Dages charge as expense, was for legal expenses in this case. Adding this to the amount reported by Timm makes a total of $3,960.49, paid by the defendant corporation, for which it should have a judgment against its codefendants, Kieswetter and Gilliam.

In the course of the trial of this case, the defendant Emil Kieswetter appeared at one of the references at which defendants' counsel were putting up witnesses for the defense, and, after remaining for several days, left, over the protest

of his counsel, went back to his home in Columbus, Ohio, and thereafter had his attorneys give notice and take his testimony *de bene esse* out there. When this testimony was offered in evidence, plaintiff's attorneys objected to the introduction of same on the ground that he having appeared in Court in the trial of the case, while testimony of his witnesses was being taken, and having left against the advice of his counsel, and having failed to answer certain questions on the cross-examination his testimony taken *de bene esse* was inadmissible, the Judge of Probate sustained this objection and excluded the testimony, but, owing to the fact that the witness was an old man, claiming that it was necessary for him to return to his business, and was a defendant in the cause against whom very large judgments had been recommended, after hearing the testimony read I felt constrained to disagree with the Judge of Probate and admitted the testimony.

All of the findings and rulings of the Judge of Probate not herein overruled are affirmed and sustained.

It is therefore ordered, adjudged, and decreed: That the plaintiff, James Mortimer, Jr., have judgment against the defendant D. T. McKeithan Lumber Corporation for $3,200, with interest from September 21, 1916, being the balance of his salary for the year commencing March 6, 1916, and ending March 6, 1917; that he have judgment against the defendants D. T. McKeithan Lumber Corporation, Emil Kieswetter, and Robert L. Gilliam for the sum of $2,642.01, with interest, paid Pace & Pace for audit, and for his costs, for both of which the defendants Emil Kieswetter and Robert L. Gilliam are to be held primarily responsible. That the defendant D. T. McKeithan Lumber Corporation have judgment against its codefendants, Emil Kieswetter and Robert L. Gilliam, for the sum of $3,906.49, with interest, the expenses of this litigation, paid by it, and for the sum of $2,642.01, with interest, paid Pace & Pace for audit and for the costs of this action.

That the defendant D. T. McKeithan Lumber Corporation have judgment against its codefendant Robert L. Gilliam for the sum of $18,666.63, with interest for overpaid salary, and for the sum of $832.73, with interest, paid expenses of Nu Pro Gum Company. That the defendant D. T. Mc-Keithan Lumber Corporation have judgment against its codefendant, Emil Kieswetter, for the sum of $1,482.39, with interest, being amount paid W. E. Langdon for audit.

It is further ordered, adjudged, and decreed that the plaintiff, James Mortimer, Jr., is entitled to 1,500 shares of the common stock of the D. T. McKeithan Lumber Corporation, of which he has received 475 shares, leaving him short 1,025 shares, and that Emil Kieswetter do surrender into the corporation 1,025 shares of such stock held by him, and that the corporation reissue and deliver the same to the plaintiff, James Mortimer, Jr.

It is further ordered that the defendants Emil Kieswetter and Robert L. Gilliam do forthwith procure for their codefendant, D. T. McKeithan Lumber Corporation, a proper renunciation of dower from the wives of Emil Kieswetter, Robert L. Gilliam, and F. L. Stein to the timber conveyed to them by McCown-Clark Company, and afterwards by them to D. T. McKeithan Lumber Corporation.

December 18, 1923.

The opinion of the Court was delivered by Mr. Justice Cothran.

Action by the plaintiff, J. Mortimer, Jr., in his individual capacity, against D. T. McKeithan Lumber Corporation, Emil Kieswetter, R. L. Gilliam, and John W. Dages. The principal grounds of the plaintiff's complaint are:

(1) That in the distribution of the capital stock of the D. T. McKeithan Lumber Corporation, organized in 1916 to take over the property of a former corporation known as D. T. McKeithan Lumber Company, the plaintiff was entitled to one-half of the $300,000 common stock issued, and that he received only $47,500 thereof; the par value

being $100 per share, that he was entitled to 1,500 shares, when he received only 475 shares; that 2,046 of the 3,000 shares were wrongfully issued to the defendant Emil Kieswetter, and that he should be required to surrender 1,025 of these shares, and that the corporation should be required to issue to the plaintiff 1,025 shares, to make up the difference between the 1,500 shares to which he was entitled and the 475 shares issued to him.

(2) That at the time of the organization of the new company, D. T. McKeithan Lumber Corporation, the plaintiff was employed as general manager, at a salary of $3,000 per annum and the use of a house worth $300 per annum; that he was discharged without cause, and is entitled to his salary for one year, amounting to $3,300.

(3) That the defendants Gilliam and Kieswetter, officers of the corporation, have entered into an unlawful and corrupt agreement, styled a "trust agreement," with the defendant Dages, as so-called "trustee," by which the product of the mill business has been turned over to Dages, at grossly inadequate prices, for the purpose of paying the debts of the corporation, including certain obligations to the Ohio National Bank, of which Kieswetter is president, to the great detriment of the plaintiff and other stockholders, and for the corrupt advantage of the defendants,· Gilliam, Kieswetter, and Dages and the Ohio National Bank.

(4) That the plaintiff has been denied the right of a stockholder to an inspection of the books and records of the corporation; that he has not only been denied all information as to the business, but that the same has been studiously and persistently concealed from him.

(5) That owing to the inexperience, incompetency, concealments, misrepresentations, and fraudulent co-operation of the defendants, officers of the corporation, its affairs have been, and are being, conducted in a careless and uneconomical manner, to the great loss and damage of the stockholders and to the plaintiff in particular.

(6) That the plaintiff is without remedy to obtain any relief by or through the corporation, by reason of the fact that it is in the hands of said defendants and all their acts and doings are hostile to the interests of the plaintiff.

(7) That by reason of the foregoing wrongful acts of the defendants, the plaintiff is entitled for his protection to a full account and discovery of the actings and doings of the defendants and of the affairs of the corporation.

The prayer for relief is:

(1) The appointment of a receiver.

(2) The production of all books and papers of the corporation for an examination by the plaintiff.

(3) Judgment for the amount of the plaintiff's salary.

(4) Injunction against disposing of or altering the books and papers of the corporation.

(5) General relief.

The defendants in their answer admit the allegations of the complaint in reference to the incorporation, capital stock, and officers of the corporation, and that the plaintiff has received 475 shares of the capital stock, that he has demanded additional shares, and the demand has been refused. They admit, also, that the plaintiff has been discharged as general manager and that he has been refused permission to examine and inspect the books and papers of the corporation. They justify such dismissal and refusal by alleging that the plaintiff wrongfully, willfully, and maliciously, with intent to harass and injure the corporation, to obstruct, hinder, and delay its operations, to impair its credit and disrupt its organization, refused to perform any of the duties assigned to him, circulated false reports among the employees that their dismissal was impending, circulating damaging reports among the creditors affecting the credit of the corporation, and committed other acts calculated to injure the corporation and its stockholders; a denial of all other allegations. The defendants also set up a counterclaim of $5,000 damages for injury done to the corporation

by reason of the wrongful acts of the plaintiff as detailed in the answer.

The plaintiff replied to the counterclaim denying the same.

In passing it will be noticed that the complaint improperly unites several causes of action: One in favor of the plaintiff for his additional stock; another in favor of the plaintiff for his arrears of salary; another in the right of the corporation for damages resulting from mismanagement; another in the right of the corporation for a conspiracy in disposing of its assets; another in favor of the plaintiff for an inspection of the records; another in favor of the plaintiff for an accounting; another for the appointment of a receiver.

It will be noticed, also, that in the report of the Master and in the decree, judgments are rendered in favor of the corporation against one or more of the codefendants for large amounts, when the complaint gives no intimation of such demands, and no such causes of action are set up by the defendant corporation in its answer and served upon such codefendants.

No objection having been raised to these manifest irregularities, no relief on this account can be afforded by this Court.

All the issues of law and fact were referred to Hon. Robert Macfarlan, Judge of Probate, as Acting Master. Various references were held, extending from June, 1919, to September, 1920. The Master filed his report on April 7, 1921, to which the defendants have filed exceptions. On October 13, 1921, Hon. Edward McIver, upon motion of the plaintiff, unopposed by the defendants, passed an order appointing Woods Dargan, Esq., receiver of the corporation. The results arrived at by the Master in his report, concisely stated, are as follows:

(1) That the plaintiff is entitled to the judgment against the corporation for $3,200 on account of salary following his unlawful dismissal.

(2) That the plaintiff is entitled to 1,500 shares of the capital stock of the corporation, of which he had received only 475 shares, leaving him short 1,025 shares; that Kieswetter be required to surrender to the corporation 1,025 shares in his custody and control; and that the corporation reissue and deliver the same to the plaintiff.

(3) That the corporation is entitled to judgment against Gilliam, Kieswetter, and Stein, officers and directors in charge of the corporation after the dismissal of the plaintiff, for $86,702.93, on account of depletion of the corporate assets through the consumption of standing timber alone.

(4) That the corporation is entitled to judgment against Kieswetter and Gilliam for $43,340.25, on account of the sale by them of 4,820,940 feet of lumber at $15 per thousand, when it was really worth $23.99.

(5) That the corporation is entitled to judgment against Kieswetter and Gilliam for $832.73, on account of charges for incorporation, attorney's fees, and litigation in connection with the Nu Pro Gum Company.

(6) That the corporation is entitled to judgment against Kieswetter and Gilliam for $18,666.63, on account of excess salary paid to Gilliam up to January 31, 1919.

(7) That the corporation is entitled to judgment against Kieswetter for $1,482.39, on account of payment of that amount out of the funds of the corporation, to W. R. Langdon, a certified accountant, for an audit submitted by him at the request and for the personal accomodation of Kieswetter and Poston, which Kieswetter had personally assumed.

(8) That the corporation is entitled to judgment against its codefendants (without naming them) for $2,085.15, on account of a payment of that amount out of the funds of the corporation, to Ernst & Ernst, certified accountants, for an audit submitted by them, at the request of the Ohio National Bank, to which the report was made and the bill rendered.

(9) That the corporation is entitled to judgment against Kieswetter and Gilliam, for $3,906.45, on account of expenses of this litigation paid by them out of the funds of the corporation; they by their conduct being directly responsible for the present litigation.

(10) That the corporation is entitled to judgment against Kieswetter and Gilliam for $2,642.01, on account of the Pace & Pace audit for Mr. Timm, which amounted to $5,284.02, one half of which was paid by the plaintiff and the other half by Kieswetter and Gilliam out of the funds of the corporation, and which by agreement of counsel was to be taxed as costs as might appear equitable.

(11) That the plaintiff is entitled to judgment against the defendants (without naming them) for $2,642.01, on account of the payment made by the plaintiff upon the Pace & Pace audit referred to in the next preceding paragraph, and that Kieswetter and Gilliam be held primarily liable therefor.

(12) That a receiver be appointed with the usual powers.

The matter then came on for trial upon the report and the exceptions of the defendants, before Hon. J. E. Peurifoy, Circuit Judge, at the Fall Term 1921. On January 28, 1922, he filed his decree.

The decree confirms the Master's report as to the following conclusions (preserving the numbering above):

(1) Judgment for plaintiff on account of salary, $3,200.

(2) The plaintiff's right to 1,025 additional shares, making up 1,500.

(7) Judgment for the corporation against Kieswetter for $1,482.39 on account of the Langdon audit.

(9) Judgment for the corporation against Kieswetter and Gilliam for $3,906.45, on account of the expenses of this litigation.

(10) Judgment for the corporation against Kieswetter and Gilliam for $2,642.01, on account of the Pace & Pace audit.

(11) Judgment for the plaintiff against Kieswetter, Gilliam, and the corporation for $2,642.01, on account of the Pace & Pace audit; Kieswetter and Gilliam being primarily liable therefor.

The decree modified the Master's report as to the following:

(5) Confirmed it as to judgment for the corporation against Gilliam for $832.73, on account of payments in connection with the Nu Pro Gum Company, and reversed it so far as judgment against Kieswetter is concerned.

(6) Confirmed it as to judgment against Gilliam for $18,666.63, on account of excess salary collected by him, and reversed it so far as judgment against Kieswetter is concerned.

The decree reversed the Master's report as to the following:

(3) Recommendation of judgment for the corporation against Kieswetter, Gilliam, and Stein for $86,702.93, on account of depletion of the corporation assets in standing timber.

(4) Recommendation of judgment for the corporation against Kieswetter and Gilliam for $43,340.25, on account of the sale by them of lumber at an inadequate price.

(8) Recommendation of judgment for the corporation against Kieswetter and Gilliam for $2,085.15, on account of the Ernst & Ernst audit.

From the decree of Judge Peurifoy both parties appealed.

The plaintiff's exceptions assign error in the reversal of the Master's findings numbered 3 and 4 above, in the modification of the findings numbered 5 and 6, and in admitting the deposition of Kieswetter. They do not cover the reversal of the finding numbered 8.

The defendants' exceptions, in addition to various matters hereinafter discussed, assign error in confirming the Master's findings numbered 1, 2, 7, 9, 10, and 11, and in confirming so much of the findings numbered 5 and 6 as recommended

judgments in favor of the corporation against Gilliam for $832.73 and $18,666.63, respectively.

In view of the fact that the former corporation, known as D. T. McKeithan Lumber Company, was succeeded by the corporation known as D. T. McKeithan Lumber Corporation, for convenience the former corporation will be referred to as the "old corporation" or "the company," and the latter, as the "new corporation" or "the corporation."

The questions arising upon the appeal will be discussed in the following order:

(1) Is the plaintiff entitled to 1,025 additional shares of the new corporation? .

(2) Is the plaintiff entitled to judgment against the corporation for $3,200, on account of salary as general manager?

(3) Is the corporation entitled to judgment against Kieswetter and Gilliam for $86,702.93, on account of depletion of standing timber?

(4) Is the corporation entitled to judgment against Kieswetter and Gilliam for $43,340.25, on account of the sale of lumber at an inadequate price?

(5) Is the corporation entitled to judgment against Kieswetter and Gilliam, or against Gilliam, for $832.73, on account of charges for incorporation, attorney's fees, and litigation expeness, in connection with the Nu Pro Gum Company?

(6) Is the corporation entitled to judgment against Kieswetter and Gilliam, or against Gilliam, for $18,666.63, on account of excess salary paid to Gilliam?

(7) Is the corporation entitled to judgment against Kieswetter for $1,482.39, on account of the Langdon audit?

(8) Is the corporation entitled to judgment against Kieswetter and Gilliam for $3,906.45, on account of costs, expenses, and disbursements in connection with the present litigation?

(9) Is the corporation entitled to judgment against Kieswetter and Gilliam for $2,642.01, on account of the Pace & Pace audit?

(10) Is the plaintiff entitled to judgment against Kieswetter and Gilliam, and secondarily against the corporation, for $2,642.01, on account of the Pace & Pace audit?

*First. Is the plaintiff entitled to 1,025 additional shares of the new corporation?*

The matter is extremely complicated and requires a full statement.

Prior to July 6, 1911, for many years, there was conducted at Lumber, in Darlington County, an extensive sawmill business under various names and managements. The history of these former operations is not relevant or illuminating to the present controversy. On that date, July 6, 1911, a corporation was organized, under the name D. T. McKeithan Lumber Company, which took over the title and operation of the property and business. The capital stock was $200,000, 2000 shares of the par value of $100 each, and was owned as follows:

| | | |
|---|---:|---|
| E. M. Poston, trustee | 1,050 | shares |
| J. Mortimer, Jr. | 400 | " |
| R. L. Gilliam | 200 | " |
| D. T. McKeithan, J. M. Barr, and W. R. Bonsal | 350 | " |
| | 2,000 | shares |

The 400 shares owned by James Mortimer, Jr., represented a substitution for 400 shares of the Williams & McKeithan Lumber Company, which he had purchased from Barr, Bonsal, and McKeithan, paying them therefor $15,000 cash and giving his note to them for $25,000 with the 400 shares as collateral. The 200 shares owned by R. L. Gilliam represented a substitution for 200 shares of the same company which he had purchased from the same

parties, paying them therefor $2,000 cash and giving his note to them for $15,000 with the 200 shares as collateral. The 1,050 shares standing in the name of E. M. Poston, trustee, were subscribed for by the New York Coal Company, of which Poston was president, and for that stock they paid in cash $105,000.

At the time of the organization of the corporation, there was issued $300,000 of bonds, which were turned over to D. T. McKeithan, J. M. Barr, and W. R. Bonsal, which with the 350 shares of stock issued to them, represented the purchase price of the property. These bonds were secured by a mortgage of certain property of the corporation.

After the company had been operating for a short time, an action was instituted by it in the Federal Court against the bondholders, on account of an alleged shortage in standing timber, under the contract of sale, and for other causes. In that litigation which apparently veered in favor of the bondholders, an injunction was issued by the Court restraining the company for disposing of its product. For this reason, and others, the plant was closed down for more than a year.

Between the date of its organization July 6, 1911, and the early part of 1915, the company had contracted debts to the amount of about $102,000, $78,000 of which was represented by notes to the Ohio National Bank, $9,000 to the City National Bank, and $15,000 to the New York Coal Company, all of Columbus, Ohio, and certain open accounts to other parties, and their statement showed a loss of over $200,000.

During the same period the company had reduced the bonded indebtedness $40,000, had accumulated about 5,000,000 feet of lumber, valued at $18 per M feet, outstanding accounts and bills receivable amounting to $20,000, and two tracts of land in Lee County, no part of which property was covered by the mortgage which secured the bonds.

Early in 1915, owing to the shutdown, adverse market

conditions, and the failure to meet the interest upon its bonds, the bondholders threatened a foreclosure of the mortgage securing the bonds.

In this emergency, the plaintiff Mortimer and the defendant Gilliam, who had practically all of their capital invested in their respective stock holdings, sought to bring about an agreement between the bondholders and the larger unsecured creditors, by which the company could resume operations, pay off its indebtedness, and save the stockholders.

After one or more tentative agreements had fallen through, Mortimer and Gilliam met with the representatives of the three large unsecured creditors, the Ohio National Bank, the City National Bank, and the New York Coal Company, at Columbus, Ohio, in May, 1915. The Ohio National Bank was represented by the defendant Kieswetter, its president; the City National Bank by Copeland, its president; the New York Coal Company by E. M. Poston, its president; and the company by R. L. Gilliam, its president.

On May 26, 1915, an agreement between these several interests was consummated, conditioned upon approval by the bondholders and certain stipulations on their part which will be explained later. There is a controversy whether or not, as a matter of fact, this agreement was actually executed; but I will assume for the moment that it was. It provided:

(1) That the company should sell, to the creditors named, all of the lumber on the yard, approximately 5,000,000 feet; that it should convey to them the real estate in Lee County, not covered by the mortgage to the bondholders, reserving standing timber; that it should convert into cash all accounts and bills receivable, and apply the proceeds to debts other than obligations to said particular creditors and the bonds, the balance, if any, to go *pro rata* to said creditors.

(2) That the Ohio National Bank should be the custodian of the money received from the sale of the lumber and real

estate and such balance as remained of the accounts and bills receivable referred to in the next preceding paragraph, for distribution *pro rata* among the three creditors named, the two banks and the coal company.

(3) That the three creditors named should fully release, discharge, and satisfy the obligations held by them, severally, against the company.

(4) That the New York Coal Company should transfer and assign to the Ohio National Bank, for the purposes of the agreement, 1,044 shares of the capital stock of the company, known as the Poston stock, to be held by it until the stipulations by the bondholders, hereafter referred to, should have been made; that in the event that such stipulations be not made, the Ohio National Bank should return the stock to the New York Coal Company; that in the event that the contract be entered into to the satisfaction of the parties, and the bondholders made such stipulations as were outlined, the Ohio National Bank should transfer said stock to Gilliam and Mortimer, in equal proportions or to such persons as they should nominate.

(5) That the agreement should have no binding effect until the bondholders had consented to same, released all claim upon the property referred to in paragraph 1 above, and agreed to such modification of the existing mortgage as would enable the company to continue operations.

It will be observed that this agreement purported to be one between the company, as party of the first part, and the three large creditors named above, as parties of the second part. Neither Gilliam nor Mortimer was individually a party thereto. It was executed by the McKeithan Lumber Company, the Ohio National Bank, the City National Bank, and the New York Coal Company.

The effort was then made by Gilliam and Mortimer to secure the assent of the bondholders to that agreement, and to stipulations by them, referred to in the agreement, without both of which the agreement would not be effective.

Accordingly, a meeting was held in the office of Willcox & Willcox, attorneys, at Florence, on June 5, 1915, at which were present: Mortimer, Gilliam, Kieswetter, representing the Ohio National Bank, the City National Bank and the New York Coal Company, and the bondholders Barr, Bonsal, and McKeithan (the latter by George E. Dargan, attorney in fact).

An agreement between these parties was formulated and signed by Mortimer, Gilliam, and the three bondholders—Barr, Bonsal and McKeithan. It did not purport to call for execution by the three creditors, and in fact was not signed by any of them. It is characterized in the Circuit decree as a "tentative agreement" and declared to have been delivered "upon what is termed a gentleman's agreement, that it was not to be binding upon the bondholders, unless the New York Coal Company should surrender its remaining six shares of stock and its claim against the company." This agreement, known as the June agreement, provided:

(1) That the proceedings in the Federal Court should be dismissed, except that the reformation of the mortgage ordered by the Court, in a certain particular, should be preserved.

(2) That Mortimer and Gilliam should acquire, hold, own, and control all of the capital stock of the company, including the shares (350) owned by the bondholders, which, with the notes of Mortimer and Gilliam held by the bondholders for the balance due on their original stock subscriptions, should be assigned, transferred, and delivered to Mortimer and Gilliam.

(3) That the company should retire all of its debts, including the interest on, but not the principal of, the bonds; the interest due to be paid out of the first moneys derived from the assets.

(4) That all assets of the company, excepted from the mortgage, should be used in retirement of the debts; the bondholders releasing all claim thereto.

(5) That the mortgage given by the company to secure the bonds should be amended in the following particulars:

(a) That the company, in the payment of interest or principal upon the bonds, should be allowed an extension, on account of certain specific casualties.

(b) That the company should pay into the sinking fund $2.50 per M feet for all trees suitable for sawmill purposes, that shall be left on the premises covered by the mortgage after they shall have been cut over.

(c) That the company should pay to the bondholders 75 cents per M feet for all timber cut or dressed at its mill, from timber not covered by the mortgage, to be applied to the bonds.

(d) That the company should submit monthly statements of operations and allow full inspection of their records.

(e) Conditions specified upon which the bondholders might institute proceedings for foreclosure.

(f) That the company should operate its mill to its capacity, the cut in any event to be not less than 800,000 feet per month.

The Florence agreement of June 5, 1915, characterized as a "tentative agreement," and also subject to the "gentleman's agreement," above referred to, evidently contemplated a further agreement, in which the company would enter.

Accordingly, in July, 1915, the same parties who attended the meeting of June 5, 1915, again met at the office of Willcox & Willcox at Florence. It is assumed that the agreement dated July ——, 1915, set forth in the record, was entered into by the parties named: The company, the three bondholders, and the trustee of the mortgage— although the copy contains no signatures at all. That agreement contains the following recitals:

(a) The execution of the preliminary agreement between Mortimer and Gilliam and the bondholders of June 5, 1915, the Florence agreement.

(b) The engagement of Mortimer and Gilliam to procure the execution of a formal contract, containing substantially the covenants in the Florence agreement.

(c) The fact that Mortimer and Gilliam had acquired and owned all of the stock of the company, a part of which had been acquired from the three bondholders.

(d) The assignment of the three bondholders, of the stock owned by them and the notes given to them by Mortimer and Gilliam, to Mortimer and Gilliam.

(e) The consent of the trustee of the mortgage to the terms of the agreement.

(f) The authorization of the agreement by the stockholders of the company, in writing held on July 6, 1915, and by the directors on the same day.

It then proceeded at length and in detail to incorporate provisions practically identical with the provisions of the June agreement, and added the following:

(10) That the mortgage be amended by allowing the company to sell any of the standing timber covered by the mortgage upon payment to the trustee of $2.50 per M feet, upon certain specified conditions.

(11) That the existing mortgage be continued of full force except as amended by the agreement.

(12) A repetition of the former mortgage as security for the obligations assumed by the company, under the agreement.

It thus appears that the agreement of July, 1915, between the company, the bondholders, and the trustees, was practically a confirmation of the agreement of June, 1915, between Mortimer and Gilliam on the one side, and the bondholders on the other.

The vital question, however, is whether either or both of these agreements was a confirmation of the Columbus agreement, through which the plaintiff lays claim to the additional stock.

By a comparison of the agreement of June, 1915, referred to as the Florence agreement, with the agreement of May, 1915, referred to as the Columbus agreement, it will appear:

(1) That the bondholders did not expressly or impliedly approve the Columbus agreement.

(2) That the bondholders did not agree that the company should sell to the three creditors the 5,000,000 feet of lumber in the yard.

(3) That the bondholders did not agree that the company should sell to the three creditors the real estate in Lee County not covered by the mortgage.

(4) That the bondholders did not agree that the Ohio National Bank should be the custodian of the proceeds of the sale of the assets referred to.

(5) That the release by the three creditors of their claims was not considered or referred to.

(6) That the transfer of the 1,044 shares by the New York Coal company was not considered or referred to.

And as has been shown the agreement of July, 1915, is practically a confirmation, and no more, of the Florence agreement of June, 1915; neither of them confirms the Columbus agreement of May, 1915.

On August 16, 1915, another agreement was entered into. This was between the company, the bondholders, and the trust company, trustee of the mortgage. The purpose and legal effect of it was to amend the mortgage in the particulars referred to in the agreements of June, 1915, and July, 1915; they need not be repeated here.

After these various agreements had been executed, the affairs and difficulties of the company appeared to be arranged and composed, and Gilliam and Mortimer proceeded, as president and general manager, with the operation of the plant. Practically all of the 5,000,000 feet of lumber on the yard, referred to in the Columbus agreement of May, 1915, and the accounts and bills receivable, were sold and collected and used in the rehabilitation of the plant and pay-

ment of interest on the bonds, a proceeding entirely inconsistent with the May agreement.

In the meantime, the 1,044 shares of stock which had been delivered by Poston to the Ohio National Bank, under the terms of the May agreement, had been returned by the bank to Poston. On July 10, 1915, more than a month after the Florence agreement of June 5, 1915, Kieswetter, president of the Ohio National Bank, received said shares, as trustee, from Poston, and issued a receipt therefor as trustee, in which he agreed "to treat with the bondholders, creditors and stockholders of the said company in the settlement of the affairs of said company to the best advantage possible." Up to this time, certainly, Mortimer and Gilliam had not acquired that stock as provided in the May agreement.

On November 15, 1915, Poston sent to Kieswetter the remaining 6 shares of the 1,050, which he held as trustee for the New York Coal Company, with a letter, in which he stated that the 1,044 shares theretofore delivered, and the 6 shares then delivered, and the claim of the coal company indorsed in blank, should be held by Kieswetter, as trustee for the coal company, until the claim of the bank had been paid, with certain expenses, and that then the whole 1,050 shares should be returned to Poston.

This demand was communicated to Mortimer and Gilliam, and to the bondholders, at a meeting held in Darlington shortly thereafter. It indicated a purpose on Poston's part to project himself and the coal company again into the affairs of the company, an event not at all palatable to the bondholders, and disappointing to the claim of Mortimer and Gilliam to the ownership of this stock. It shattered the last plan which had been adopted for the continued operation of the plant.

Mortimer and Gilliam refused to further operate the plant, if the demand of Poston should be recognized, and the bondholders declared in favor of a foreclosure of the mortgage securing their bonds.

The foreclosure appears to have been satisfactory to Mortimer and Gilliam, and to have been a step in the proceedings for the reorganization of the company.

A new corporation was organized, under the name of D. T. McKeithan Lumber Corporation, with authorized capital stock of $300,000 preferred and $300,000 common stock.

At that time the capital stock of the old corporation, D. T. McKeithan Lumber Company, $200,000, stood in the names of the following stockholders:

E. M. Poston as trustee............... 1,050 shares
R. L. Gilliam ....................... 475   "
J. Mortimer, Jr. .................... 475   "

                                     2,000 shares

—the 350 shares which originally belonged to the bondholders having been transferred to Mortimer and Gilliam by them.

The amount of the outstanding bonds was $260,000, $40,000 having been paid upon them.

The Circuit Judge held:

"I unhesitatingly find the agreement to have been that all parties should have the same interest in the new corporation as they had in the old. Certainly, under the circumstances, no other agreement would have been just or equitable."

This conclusion is supported by the evidence in the case.

Accordingly, out of the $300,000 of common stock, the parties should have received the following:

E. M. Poston as trustee ............ 1,575   shares
R. L. Gilliam ..................... 715.5   "
J. Mortimer, Jr..................... 712.5   "

                                     3,000   shares

—leaving out of view for the moment the question whether or not Mortimer and Gilliam were entitled to the Poston

stock. If they were, they would have been entitled to 787.5 shares more, or 1,500 shares each.

Thereafter the mortgage was foreclosed, and the mortgaged property was bought in at the foreclosure sale by Bright Williamson, as agent of the bondholders. Pursuant to instructions from them, he transfrered his bid to Mc-Keithan Lumber Corporation, which had been organized to acquire and operate the property, in consideration of $260,-000 of the corporation's bonds, secured by a mortgage of the property, $100,000 of the preferred stock, and $300,-000 of the common stock of the new corporation.

Thereupon Williamson, for the bondholders, delivered the bonds in the sum of $260,000 to them, and directed that the common stock be issued to the following:

| | |
|---|---|
| Emil Kieswetter | 2,046 shares |
| R. L. Gilliam | 474    " |
| J. Mortimer, Jr. | 475 .  " |
| R. L. Gilliam | 1    " |
| Henry Grimble | 1    " |
| T. C. Cork | 1    " |
| Geo. E. Dargan | 1    " |
| Emil Kieswetter | 1    " |
| | 3,000 shares |

Of the $300,000 of preferred stock, the $100,000 received by Williamson in the trade was turned over by him to the Ohio National Bank, as collateral security to its claim of $78,000; the remaining $200,000 does not appear to have been issued.

The 2,045 shares issued to Kieswetter evidently represented what was supposed to be the proportion of the new stock to which the old Poston stock was entitled, but in the calculation the proportionate interests of Mortimer and Gilliam in the new stock were overlooked; they each should have received 712.5 shares instead of 475, as above shown.

The Master finds that Mortimer is entitled to 1,500 shares of the capital stock of the new corporation. The Circuit Judge confirms that finding. I do not concur in that conclusion, and propose to give the reasons therefor.

The 1,050 shares in the old corporation, certainly, at one time, belonged to E. M. Poston, as trustee for the New York Coal Company. If it now belongs to Mortimer and Gilliam, or belonged to them at the time of the reorganization, the manner of their acquisition and of Poston's disposition should be traced as clearly as the title to a piece of real estate.

Obviously, the title to them is attempted to be founded upon the May agreement in Columbus. The Circuit Judge holds:

"Mortimer and Gilliam, having secured from the bondholders the contract agreeing to the terms of the May contract, and having secured the modified mortgage required, the contract of May became operative and binding upon all parties thereto."

The May agreement in Columbus was one between the company, on the one side, and the three principal unsecured creditors, on the other. By it, Mortimer and Gilliam proposed to acquire for themselves a transfer of the entire Poston stock of 1,050 shares. The consideration for this transfer was supplied, not by Mortimer and Gilliam, who expended not a dollar, but by certain concessions to be made by the company. In other words, Mortimer and Gilliam, who were president and general manager, respectively, of the company, and as such trustees of the corporation, were attempting to use engagements and concessions by the corporation, to secure personal benefits for themselves. If therefore it should be concluded that the May agreement was confirmed by the bondholders and the company, in the June and July agreements, Mortimer and Gilliam should be considered trustees for the corporation of the advantages secured by the May agreement. But I think that it un-

questionably appears that the May agreement was never confirmed by the bondholders or by the company as contemplated, and that it consequently never went into effect; that the source of Mortimer's title to the Poston stock is as a "summer dried fountain."

After the company had been operated by Gilliam and Mortimer from the time of its organization up to about the first of May, 1915, its affairs were in a desperate condition. The books showed a loss during that period of over $200,000. It owed the Ohio National Bank $78,000, the City National Bank $9,000, and the New York Coal Company $15,000, besides an undefined amount of open accounts. It had fallen behind in the payment of interest upon the $300,000 of bonds, and a foreclosure of the mortgage securing the bonds was threatened.

At that time the company had upon its yard 5,000,000 feet of lumber, valued at $18 per M, $90,000; accounts and bills receivable, $20,000; and two tracts of land in the county of an unstated value. None of this property was covered by the mortgage.

It was then that Mortimer and Gilliam went to the meeting in Columbus, in May, 1915, with the principal creditors, and for the company entered into the agreement which is more fully analyzed above.

The three principal creditors were also in a dilemma. They were confronted with a situation which threatened the loss of their $102,000; for in the event of the threatened foreclosure, they might hope for little, if any, dividend. There was in sight lumber on the yard, accounts and bills receivable, and the Lee County lands, not covered by the mortgage, which would almost, if not quite, satisfy their demands. The agreement provided that this property should be turned over to the Ohio National Bank as custodian, for the benefit of the three creditors, and that, in consideration thereof, they would release their claims upon the company; and in the event that certain modifications of the mortgage

should be made, the Poston stock should be transferred to Mortimer and Gilliam. This agreement was not to take effect until approved by the bondholders and the proposed modifications of the mortgage had been consummated.

Mortimer and Gilliam attempted to obtain the consent of the bondholders to the May agreement and the modification of the mortgage. The evidence of their asserted compliance lies in the agreements of June and July, 1915, heretofore analyzed. The pivotal question is whether or not they succeeded.

I think that the following facts show conclusively that they did not succeed:

(1) Not a stick of the 5,000,000 feet of lumber on the yard was delivered to the Ohio National Bank, as contemplated by the May agreement, or authorized to be so delivered by either the June or July agreements. On the contrary, it was retained by the company, under the management of Mortimer and Gilliam, was sold and disposed of in accordance with the agreements subsequent to the May agreement, and in accordance with the terms of the modified mortgage, and the proceeds applied to the rehabilitation of the plant and the payment of interest upon the bonds.

(2) The two tracts of land in Lee County were not conveyed to the Ohio National Bank, as contemplated by the May agreement, or authorized to be so conveyed by either the June or July agreements. On the contrary, they were retained by the company, under the management of Mortimer and Gilliam, until after the mortgage was foreclosed, and were then conveyed to Bright Williamson, and by him to Gilliam, in whose possession they still are.

(3) The agreemnet of June, 1915, provides specifically that the property referred to in the two next preceding paragraphs hereof should be applied to debts of the company, including debts other than those of the three principal creditors, and interest upon the bonds; in direct contravention of the May agreement that it should be applied

to the claims of the three creditors alone, and that the bond-holders should release all claim thereto. ·

(4) The agreement of July 15, 1915, amendatory of the June agreement, provides that the proceeds of the sale of the lumber shall be applied to the payment of other and additional interest due to the bondholders, and a charge of $3 per M feet is put upon it to secure such additional interest; in direct contravention of the May agreement, as stated in paragraph 3 hereof.

(5) The modified mortgage, in express terms, provides that a part of the proceeds of the lumber shall be applied to the interest secured by the mortgage; in direct contravention of the May agreement, as above stated.

The contemporaneous conduct of the parties shows that the agreements of June and July, 1915, were not considered as a compliance with the terms of the May agreement, so as to entitle Mortimer and Gilliam to the Poston stock.

Evidently, after knowledge of the June, 1915, agreement (which, as I have endeavored to show, was not only inconsistent with, but positively antagonistic to, the terms of the May agreement) reached Poston, the 1,050 shares which he had left with the Ohio National Bank, to carry out the terms of the May agreement, were reclaimed by him; for we find that on July 10, 1915, Kieswetter received from Poston the 1,044 shares, and issued his receipt therefor, in which he acknowledged that he held them as trustee, not to turn them over to Mortimer and Gilliam, as if the May agreement had been complied with, but "to treat with the bondholders, creditors, and stockholders of the said company, in the settlement of its affairs, to the best advantage possible." It will be noted, also, that the May agreement provides, in terms, that if there should be a failure to confirm the May agreement, the stock should be returned to Poston. Evidently it was returned for such failure, and a deposit of it made with Kieswetter later, upon terms entirely independent of the May agreement.

On September 24, 1915, Gilliam, who was equally interested with Mortimer in the Poston stock, wrote his attorney:

"Mr. Poston, representing the New York Coal Company, has turned his stock over to the Ohio National Bank, to be held by them until such time as their indebtedness has been taken care of. After that has been done, the stock will be divided betwen Mr. Mortimer and myself."

This was more than three months after the June agreement, which Mortimer now contends confirmed the May agreement, and gave him the right to one-half of the stock. Evidently, as shown by his letter, Gilliam had no such conception. A copy of this letter was mailed to Mortimer, who made no protest or claim such as he now sets up.

Prior to this last date, on August 14, 1915, Poston writes to Kieswetter, referring to the verbal agreement under which Kieswetter held the stock, claiming it as his own, and impliedly negativing any idea of responsibility to Mortimer under the May agreement.

On November 15, 1915, Poston remitted to Kieswetter the remaining 6 shares of the 1,050, with a letter in which he stated:

"We turn these over to you in order that you may hold the same, together with 1,044 shares and our claim of $14,983.53, all delivered to you as our trustee, July 10, 1915, you to hold same in such capacity until you have paid off the bank's claim and the bills of attorneys, when you are to return all to us"

—a very far cry from an acknowledgment of Mortimer's interest as claimed under the May agreement.

During this period, after the June agreement, the bondholders delivered to Mortimer and Gilliam the 350 shares, originally issued to them, and surrendered their notes and collateral stock; and yet no demand appears to have been made upon Kieswetter or Poston for the 1,050 shares claimed under the May agreement.

If Kieswetter, who held the Poston stock, had authority to make any agreement, inconsistent with the explicit terms upon which he held it as trustee, which I greatly doubt, the evidence conclusively shows that it was to be delivered to Mortimer and Gilliam only upon payment of the debts of the company.

Mr. P. A. Willcox, Mr. Mortimer's witness who was present at all the conferences in Florence when Mr. Mortimer contends a different agreement was made, testifies that—

"The agreement as to the delivery to Messrs. Gilliam and Mortimer of the stock held or controlled by Mr. Kieswetter was that it was to be delivered to them when the debts of the company were paid."

Mr. J. M. Barr, who also attended said conferences and participated in all negotiations leading up to the modification of the mortgage says:

"After the execution of the agreements, which are in evidence and to which I have testified, the Ohio National Bank, through Mr. Kieswetter, agreed to finance the company, provided the stock was placed in the hands of the bank until the company discharged its obligations; that is, all of this stock."

Mr. W. R. Bonsal, who was also present at the conferences in Florence, says:

"Arrangements were made with the bank in Columbus, Ohio, to finance the operations of that company.    Mr. Kieswetter was president of the bank.    I understood that he was to take over the stock, before he would finance the company.    This stock was to be held until the debt of this bank was paid off, and then it was to go back to the stockholders."

Mr. R. L. Gilliam testifies:

"Mr. Kieswetter did agree on behalf of the bank to finance the company, if the company would agree to pay back the entire indebtedness of the bank; and with a pro-

vision that Mr. Kieswetter, in the interest and protection of the bank, was to hold the controlling interest in the company, until their debt was paid."

To show how vital to the life of the May agreement the provisions as to the delivery of the lumber, accounts, bills receivable, and the Lee County property were considered, at the time of that agreement a separate agreement between Mortimer and Gilliam and the three creditors was entered into, wherein Mortimer and Gilliam, as agents of the custodian bank, agreed to receive and liquidate the assets of the lumber company, and turn over the proceeds to the bank.

And to show the inconsistency between the May agreement and the agreements of June and July, under the latter a part of the proceeds of this property was to be applied to the mortgage debt, and it was shown that $8,895.75 was actually paid to the Bank of Darlington out of the proceeds of the lumber, and applied to the mortgage debt.

Not a dollar of the debts due the Ohio National Bank, the City National Bank, or the New York Coal Company has been paid, and every dollar of the proceeds of the lumber, accounts, and bills receivable, aggregating in the neighborhood of $100,000, applicable under the May agreement to these debts, has been diverted to the payment of other obligations. How it can be affirmed that the May agreement has been confirmed, either in word or deed, is beyond my comprehension or imagination.

I may say, in addition, that it is a most remarkable conclusion that the stock of Poston in the old corporation, which, according to the conclusion of the Circuit Judge, gave him the right to participate pro rata in the new stock, can be transferred from him to Mortimer, under the theory that the May agreement has been complied with, in a proceeding to which Poston is not even a party.

The net result of the decree, in the conclusion that Mortimer is now entitled to one-half of the common stock of the new corporation, is astounding: Mortimer, who admittedly

has paid in upon his stock subscriptions only $15,000, and
has not paid or procured the payment of a single dollar upon
the debts referred to in the May agreement, the source of
his title, if he has any, becomes owner of stock to the amount
of $150,000, ten times what he has paid in; while the New
York Coal Company, which paid $102,500 for its stock,
in hard cash, and has a claim of $15,000 unpaid, finds its
stock swallowed up by the May agreement and gets nothing
upon its claim.

> *Second. Is the plaintiff entitled to judgment against
> the corporation for $3,200 on account of salary as
> general manager?*

Prior to the organization of the new corporation, the
plaintiff had been general manager of the old corporation,
with the very extensive powers incident to that position.
Upon the organization of the new corporation, Gilliam was
made president and charged with the general operation of
the business, greatly curtailing the authority which Morti-
mer had previously exercised. Mortimer became manager
and specifically made subject to the commanding authority
of Gilliam. He was naturally disconcerted by this demotion,
but appears to have accepted the situation. If his disap-
pointment prevented loyal support to Gilliam's administra-
tion, he should have declined the appointment.

The Master finds:

"Almost immediately after the new corporation was put
into operation, friction arose between Mortimer and Gil-
litm. Mortimer was in law to blame."

It is true, I think, that friction arose between them,
caused in the main by Mortimer's failure to receive the
proportion of stock in the new corporation which he claimed,
by his disappointment at being reduced to subordination,
and by his thwarting the improper efforts of Gilliam to
withhold certain lumber from the royalties due to the bond-
holders for the sinking fund, which is fully explained in
the master's report. I do not agree with the Master that

in all these matters Mortimer was to blame. He was, as I have endeavored to show, entitled to 712.5 shares of the new corporation instead of 475. He was clearly right in opposing Gilliam's plan to withhold certain lumber from the sinking fund. It was mainly on account of these matters that he was considered troublesome and was discharged. While his demand for one-half of the stock was unjustified, that was a matter that did not affect his duties as manager of operations, and, as both parties were wrong in their contentions, that was a matter for legal adjudication and not for discharge. Outside of these matters, I do not find sufficient evidence of his unfitness or failure to discharge his duties as warranted dismissal, and agree with the conclusions of the Master and Circuit Judge as to this item.

*Third. Is the corporation entitled to judgment against Kieswetter and Gilliam for $86,702.93, on account of depletion of standing timber?*

The Master finds that during the Gilliam administration, there was cut 39,198,986 feet of lumber. He charges this as:

| | | |
|---|---:|---:|
| Standing timber, to Kieswetter and Gilliam, at $7.50 per M..... | | $293,992.39 |
| He credited them with cost of production at $1.96 per M......$ | 76,830.01 | |
| Amount paid to sinking fund.... | 97,997.46 | |
| Profit charged to them on the books | 32,461.99 | 207,289.46 |
| Balance ................. | | $ 86,702.93 |

—which he considers to represent the depletion of corporate assets due to their culpable negligence, in the conduct of operations, and recommends that the corporation have judgment against them in that amount.

The Circuit Judge reverses the Master as to this item, and I concur with him for the reasons stated in the decree.

*Fourth. Is the corporation entitled to judgment against Kieswetter and Gilliam for $43,340.25 on account of the sale of lumber at an inadequate price?*

The Master finds that when the new corporation absorbed the assets of the old corporation, on March 6, 1916, it took over 4, 820,940 feet of manufactured lumber on the yard at the time. It was charged to the new corporation at $15 per M. The Master finds that it should have been charged at $23.99, a difference of $8.99 per M, amounting to $43,-340.25, for which he recommends that the corporation have judgment against Kieswetter and Gilliam on account of their negligent waste of the assets of the corporation.

The Circuit Judge reverses the Master as to this item, and I concur with him for the reasons stated in the decree.

*Fifth. Is the corporation entitled to judgment against Kieswetter and Gilliam, or against Gilliam, for $832.73, on account of charges for incorporation, attorney's fees, and litigation expenses in connection with the Nu Pro Gum Company?*

This matter is fully explained in the Master's report and in the decree, to which resort may be had. The Master held that both Kieswetter and Gilliam were liable for the item and recommended judgment in favor of the corporation against them. The Circuit Judge sustained the Master's finding and recommendation so far as Gilliam is concerned and reversed him as to Kieswetter. I concur with the Circuit Judge as to this item, for the reasons stated by him in the decree.

*Sixth. Is the corporation entitled to judgment against Kieswetter and Gilliam, or against Gilliam, for $18,666.63, on account of excess salary paid to Gilliam?*

Shortly after the organization of the new corporation, Kieswetter, Gilliam, and Stein, being in control of the corporate stock, with the exception of the 475 shares issued to Mortimer (in fact, from the time of his discharge Morti-

mer was denied all participation in the affairs of the company and even an inspection of its records), reduced the number of directors to three, and elected themselves those three, and filled the offices by the election of Gilliam president, Kieswetter secretary and treasurer, and Stein assistnat secretary and treasurer. In October, 1916, at a directors' meeting held in Columbus, Ohio, they voted to themselves salaries as follows: Kieswetter, $7,200; Stein, $4,800; and Gilliam, an increase from $3,600 to $10,000. Kieswetter and Stein have not drawn their salaries, but Gilliam has; the excess amounting to $18,666.63.

The Master recommended that the resolution authorizing these salaries be rescinded and that the corporation have judgment against Kieswetter and Gilliam for $18,666.63. The Circuit Judge confirmed the Master's recommendation as to a rescission of the resolution and so much of it as recommended judgment against Gilliam for said excess, but reversed it so far as judgment against Kieswetter is concerned.

I concur with the Circuit Judge in his conclusions for the reasons stated by him in his decree.

> *Seventh. Is the corporation entitled to judgment against Kieswetter for $1,482.39, on account of the Langdon audit?*

This matter is fully explained in the report of the Master and the Circuit Decree. The Master recommended that the corporation have judgment against Kieswetter for the amount stated, which was confirmed by the Circuit Judge.

I concur in the disposition of this item for the reasons stated in said report and decree.

> *Eighth. Is the corporation entitled to judgment against Kieswetter and Gilliam for $3,906.45, on account of costs, expenses, and disbursements in connection with the present litigation?*

The findings of fact and conclusions of the Master and Circuit Judge in reference to this item are entirely satisfactory to me, and I concur therein.

*Ninth. Is the corporation entitled to judgment against Kieswetter and Gilliam for $2,642.01, on account of the Pace & Pace audit?*

The findings of fact and conclusions of the Master and Circuit Judge in reference to this item are entirely satisfactory to me, and I concur therein.

*Tenth. Is the plaintiff entitled to judgment against Kieswetter and Gilliam, and secondarily against the corporation, for $2,624.01, on account of the Pace & Pace audit?*

The findings of fact and conclusions of the Master and Circuit Judge in reference to this item are entirely satisfactory to me, and I concur therein.

Recapitulating my opinion is that the Circuit Court Decree should be affirmed as to all of the items above enumerated except the first: as to it, the decree should be modified to this extent: That Mortimer be adjudged entitled to 712.5 shares of the capital stock of the D. T. McKiethan Lumber Corporation; that of the 2,046 shares standing in the name of Kieswetter, he be required to surrender to the corporation 237.5 shares; and that the corporation issue to Mortimer that amount of stock.

Messrs. Justices Watts and Marion concurring, this opinion becomes the judgment of the Court.

Mr. Chief Justice Gary did not participate.

Mr. Justice Fraser: I dissent. I think the findings of the Master should be sustained.

On Petition for Rehearing

PER CURIAM. Upon a consideration of the petition for a rehearing in this case, the Court is satisfied that error has been committed by it in assuming that the 400 shares held by Mortimer and the 200 held by Gilliam were issued to them by the D. F. McKeithan Lumber Company, upon subscriptions made by them to the stock in that company. In order therefore to correct that error and its consequences, it is ordered:

1. That the following statements in the opinion be stricken out:

"J. Mortimer, Jr., for his 400 shares paid $15,000 in cash and gave his note to the bondholders (from whom the corporation purchased the property) for $25,000, with his stock as collateral. R. L. Gilliam, for his 200 shares, paid $2,000 in cash and gave his note to the bondholders for $15,-000 with his stock as collateral."

And that the following statements be inserted in lieu thereof:

"The 400 shares owned by James Mortimer, Jr., represented a substitution for 400 shares of the Williams & McKeithan Lumber Company, which he had purchased from Barr, Bonsal, and McKeithan, paying them therefor $15,-000 cash and giving his note to them for $25,000 with the 400 shares as collateral. The 200 shares owned by R. L. Gilliam represented a substitution for 200 shares of the same company which he had purchased from the same parties, paying them therefor $2,000 cash and giving his note to them for $15,000 with the 200 shares as collateral."

2. That the following statements in the opinion be stricken out:

"It is worthy of notice that in the original distribution of the stock of the old corporation, Mortimer subscribed for $40,000 of stock. He paid $15,000 cash and gave his note to the bondholders, for $25,000, with the stock as collateral. By the agreement of June, 1915, he obtained a cancellation of his note with return of his pledged stock, and 75 of the 350 shares held by the bondholders. He has therefore, for $15,000, received 475 shares of the old corporation."

"Gilliam subscribed for $20,000 of stock. He paid $2,-000 cash, and gave his note for $15,000, to the bondholders, with the stock as collateral. By the agreement of June, 1915, he obtained a cancellation of his note, with return of his pledged stock, and 275 of the 350 shares, held by the bond-

holders. He has therefore, for $2,000, received 475 shares of the old corporation."

"Mortimer is claiming 1,025 shares additional in the new corporation under the May agreement, without any pretense of having furnished any other consideration than what is contained in that agreement. Gilliam appears to be content with what he has."

3. That the following statements in the opinion be stricken out:

"There are two very peculiar circumstances connected with this transaction: (1) At the organization of the old company in 1911, Mortimer subscribed for 400 shares of stock. He paid in $15,000 cash (we assume, of course, to the company), and gave his note to the bondholders, for $25,000, with the stock as collateral. This obligation for the unpaid portion of his subscription was an asset to the company, not of the bondholders, and why it should have been given to them, and not to the company, is not understood. It may explain the complacency with which the bondholders, under the June agreement, were willing to cancel the note, in which they really had no interest, and surrender to Mortimer the collateral stock. By this arrangement the company not only received nothing upon the $25,000 note, which belonged to it, but incurred a capital stock liability to Mortimer for the surrendered stock, $25,000. Before Mortimer can be held entitled to this block of stock, he should be required to account for the note given by him for the unpaid subscription. The interest of Gilliam in the $20,000 of similar stock is subject to the same observations."

4. That the following statements in the opinion be stricken out:

"Provided that Mortimer account to the corporation for the $25,000 due by him upon his original subscription; that in the event of his failure to do so within 60 days from the filing of the remittitur, his holdings in the original corporation be reduced to 225 shares, representing the 150 shares,

all that he paid for, and 75 shares received by him from the bondholders, and that his holdings in the new corporation be 225 shares plus 50 per cent thereof, 112.5 shares, total 337.5 shares; but as no objection has been raised to the issue of 475 shares in the new corporation, let it stand at that."

5. That the following statements in the opinion be stricken out:

"If Mortimer is entitled to one-half of the 3,000 shares of the new corporation, under the May agreement, by the same token Gilliam is also entitled to the same proportion. Mark the result so far as Gilliam is concerned: He has admittedly paid in upon his stock subscription only $2,000, and has not paid a dollar upon the debts referred to in the May agreement; he would become the owner of stock to the amount of $150,000, 75 times what he has paid in. And yet Mortimer complains that Kieswetter has received 2,046 shares in the new corporation for which he has not paid a dollar. He forgets that the stock issued to Kieswetter represents the Poston stock for which the coal company paid in cash $102,500."

6. The other matters referred to in the petition have been duly considered. The Court adheres to the opinion relating to them.

7. That the petition be dismissed except as herein indicated, and that the stay of the remittitur be revoked.

MR. JUSTICE FRASER: I did not concur in the majority opinion, but consent to any change desired by the majority in their opinion. I concur.